**Jeanie MENTAVLOS, Plaintiff,**

v.

**John Justice ANDERSON; and James Saleeby, Defendants.**

No. CA 3:97–2718–17.

United States District Court,
D. South Carolina,
Columbia Division.

Feb. 15, 2000.

Leon Friedman, New York City, Richard A. Harpootlian, Robert G. Rikard, Columbia, SC, for Plaintiff.

Sandra Jane Senn, Charleston, SC, J. Brady Hair, North Charleston, SC, Diedreich P. von Lehe, III, Charleston, SC, Stephanie P. McDonald, Charleston, SC, for Defendants.

Morris Dawes Cooke, Jr., William E. McIntosh, Barnwell Whaley Patterson and Helms, LLC, Charleston, SC, for The Citadel.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

JOSEPH F. ANDERSON, Jr., District Judge.

This matter is before the court on motion of defendants John Justice Anderson and James Saleeby for summary judgment and, with consent of all parties, for determination by the court of any factual issues relating to whether these defendants are state actors. The state actor inquiry is critical to any determination of liability under plaintiff's sole remaining claim, which is asserted under 42 U.S.C. § 1983, as to the moving defendants.

Plaintiff alleges that defendants Saleeby and Anderson violated plaintiff's constitutional rights to equal protection under the Fourteenth Amendment by taking actions against plaintiff with the intent and to the effect of depriving her of equal access to educational opportunities at a state college. To support this claim, plaintiff must demonstrate, *inter alia,* that these defendants were "state actors" for purposes of imposing liability under 42 U.S.C. § 1983. This critical threshold issue presents a novel question.

The facts relevant to the state actor issue are largely undisputed. However, to the extent factual issues are presented, the parties have consented to resolution of the factual questions by this court. *Milburn by Milburn v. Anne Arundel County DSS,* 871 F.2d 474, 476 (4th Cir.), *cert. denied,* 493 U.S. 850, 110 S.Ct. 148, 107 L.Ed.2d 106 (1989) (state actor determination "depends on the facts of the case, as it must in each instance"). This order also confirms earlier oral rulings on these defendants' motions for summary judgment and provides further rulings on matters held under advisement.

## BACKGROUND

This action is pursued by Jeanie Mentavlos, who was one of the first female students at The Citadel, a state supported institution of higher education in South Carolina.[1] Plaintiff initially alleged that a number of cadets and one army officer assigned to the school conspired to harass plaintiff and drive her from the school because of her gender. Plaintiff asserted claims against the individual defendants under both 42 U.S.C. § 1983 and 42 U.S.C. § 1985.

The original complaint also alleged that The Citadel was liable for the collective

---

1. Plaintiff entered The Citadel in the fall of 1996 along with three other female students. A female student had entered the prior fall, but remained at the school only a brief time.

acts of harassment by faculty and students under Title IX of the Education Amendments of 1972, 20 U.S.C § 1681, *et seq.* In her Title IX claim, plaintiff asserted that the institution had actual knowledge of severe and pervasive gender-based harassment, but failed to adequately respond. Plaintiff alleged that the harassment she suffered was of a kind and degree more severe than inflicted on similarly situated male cadets and that this increased harassment ultimately forced her to withdraw from the school.

The case proceeded through extensive discovery. All defendants except for one defendant who is in default, Edward Bohm, moved for summary judgment as to all claims. These motions were fully briefed and argued. The court requested and received supplemental briefing to help clarify which allegations related to which parties. The court then heard supplemental arguments and made oral rulings as to a number of claims. The remaining allegations were taken under advisement.

In the course of hearing argument on the motions for summary judgment, the court allowed plaintiff to amend her complaint to allege that the individual cadet defendants were themselves state actors for purposes of imposing Section 1983 liability. Prior to that amendment, plaintiff's state actor allegations depended on proof that the cadet defendants acted in concert with one or more members of the college's faculty or staff, including a member of the armed services temporarily assigned to the college.

All claims except those asserted against defendants John Justice Anderson, James Saleeby, and Edward Bohm were resolved by settlement prior to any final ruling on the summary judgment motions.[2] The claims against defendant Bohm are not at issue here as he is in default.

The remaining claims against the remaining defendants were set for trial and a jury was selected. On plaintiff's motion and over defendants' objections, the court subsequently dismissed the jury so that the newly-raised state actor theory could first be addressed. The decision to release the jury rested, in part, on all parties' consent to this court's resolution of any underlying factual questions on the state actor issue.

During, or shortly prior to, the hearing on the state actor issue, plaintiff withdrew her allegations under Section 1985, her allegations of violation of due process under Section 1983, and her claims of a Section 1983 conspiracy. Therefore, the only claims remaining against defendants Anderson and Saleeby are based on Section 1983 and allege violation of plaintiff's Fourteenth Amendment right to equal protection of the laws.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir.1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to

---

2. At the time of settlement, this court had orally granted various defendants' motions for summary judgment as to certain claims, denied the motions as to certain claims, and still held a number of issues under advisement.

The settlement, necessarily, mooted this court's prior rulings as to any settling defendants and the remainder of the motions held under advisement.

the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). When the defendant is the moving party and the plaintiff has the ultimate burden of proof on an issue, the defendant must identify the parts of the record that demonstrate the plaintiff lacks sufficient evidence. The nonmoving party, here the plaintiff, must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985). Therefore, "[m]ere unsupported speculation ... is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Business & Educational Radio, Inc.,* 53 F.3d 55, 62 (4th Cir.1995).

## FACTS REGARDING LIABILITY

While defendants concede that some of the interactions between the parties occurred, there are significant differences as to the details of the events. However, because this matter is before the court on these defendants' motion for summary judgment, the court must view the record in the light most favorable to the plaintiff.[3]

Plaintiff has produced evidence which, if believed, would show that Cadet Saleeby was involved in three instances of harassment or improper treatment of plaintiff:

1. The Fire Incident—Saleeby, together with Bohm, came into plaintiff's room in October 1996 and lit plaintiff's clothing on fire. The fire was first lit by Bohm. Plaintiff promptly put out the fire using her hands. After Saleeby commented that plaintiff did not have permission to move, Saleeby then directed Bohm to again set fire to plaintiff's clothes. Bohm did so. This time, plaintiff did not move. As the flames grew, defendant Saleeby used his foot to put out the fire. Plaintiff described the action of putting out the fire as kicking or brushing her with his foot. The kicks were apparently to plaintiff's waist area.[4] The force was adequate to knock plaintiff back, but not to knock her down or leave bruises. The fire did not cause any burns to plaintiff, but did burn a hole about the size of a tennis ball in her sweatshirt.

2. The Kicking Incidents—On one or more later occasions, defendant Saleeby kicked plaintiff in the legs. At least once, he did so after saying that plaintiff "likes to be kicked." None of these incidents left bruises on the plaintiff.

3. The Shorts Incident—On one occasion fairly early in the school year, cadet Saleeby entered plaintiff's room wearing only non-uniform shorts and shower-type shoes. He did not have on a shirt. Plaintiff believed at the time that the shorts were boxer shorts (underwear) and she felt uncomfortable, although she did not believe that anything about the visit was sexual in nature. Defendant Saleeby subse-

---

3. Unlike that portion of this order that (by consent) resolves disputed facts as to the state actor issue, the recitation of facts in this section regarding potentially liability-producing events is taken in the light most favorable to the plaintiff. Some of these events are hotly disputed by the defendants.

4. The fire was set to the pouch pocket on the front of plaintiff's sweatshirt. This pocket is located at or near the waist. Plaintiff has testified that this "kicking action" was used to

put out the fire, although plaintiff felt Saleeby used more force than necessary for this purpose. Prior to plaintiff's disallowed affidavit that was submitted after jury selection (*infra* n. 7), there was no suggestion that the kick was to any area other than the stomach, hip or waist, as testified by another female cadet present during the incident. Plaintiff's own testimony regarding a kick to the waist area may, however, relate to another incident.

quently produced an affidavit and photograph demonstrating that the shorts were gym shorts, rather than boxer shorts (underwear). Plaintiff has offered no contrary evidence of the actual nature of the shorts, as opposed to her perception at the time.[5]

At a hearing set for oral ruling on the motion for summary judgment, plaintiff withdrew any claims that Saleeby should be held liable for events involving a second fire or making plaintiff sit on an upturned trash can (the so-called "naughty knob bucket" routine)[6] for an extended period of time. Both of these events involved cadet Bohm. There was no evidence offered to connect Saleeby to these events. There are no other viable claims against defendant Saleeby.[7]

Plaintiff has produced evidence which, if believed, would show that Cadet Anderson was involved in three different instances of harassment or improper treatment of plaintiff:

1. The Cardboard Incident—Early in the school year, when correcting plaintiff for smiling when she was at attention, Anderson took plaintiff into *another* room and shut the door with only the two of them present. Anderson began ranting and raving at plaintiff, pushing cardboard into her face and chin. The incident left welts under plaintiff's chin that lasted for one or two days. During the incident, Anderson made crudely worded comments to the effect that he had been sloppy when he first came to The Citadel, but the experience whipped him into shape quickly and could do the same for plaintiff.[8] He also stated that even though his parents had taught him "not to hit girls," he would make an exception for plaintiff.

2. The Thanksgiving Drinking Incident—Cadet Anderson was involved in an incident in which plaintiff was disciplined by upperclassmen for coming in drunk just before the Thanksgiving break. Anderson's involvement was limited to stopping plaintiff and a female classmate and sending them to the company commander's room. Plaintiff alleges that this limited involvement is actionable because Anderson treated the two female cadets differently than two male classmates based on gender differences rather than on differences in behavior. Plaintiff's testimony has varied as to the details of this incident, and it is not clear from the record whether plaintiff was with the male cadets when she was stopped or whether the circumstances differed between them such that, even if the four freshmen were together, Anderson had no reason to stop the males.

3. The Threats of Physical Violence—Anderson made threatening statements to plaintiff at various times, including statements that he would physically harm or kill plaintiff or her brother, who was an upperclass cadet at The Citadel.

---

**5.** In her deposition in this action, plaintiff was asked whether Saleeby had on underwear beneath the shorts at issue. Plaintiff replied: "I don't know whether he did or not. I just saw *what appeared to be boxer shorts or shorts with no shirt and no shoes*." Pltf depos (December 1998) at 174 (emphasis added).

**6.** Freshman at The Citadel are referred to as "knobs."

**7.** After the oral ruling on summary judgment, and on the eve of a final pretrial hearing relating to the state actor issue, plaintiff submitted an affidavit that included some additional allegations relating to cadet Saleeby that were not previously presented to the court. For reasons set forth in its order on Motion to Strike Affidavit (entered December 14, 1999), this court rejected any new allegations contained in this affidavit, except as they related to the state actor issue.

**8.** Plaintiff characterized the comments very differently in her most recent affidavit, which this court rejected as discussed in its order on Motion to Strike Affidavit. *Supra* note 7.

In addition to the above allegations, plaintiff had alleged that Anderson went into plaintiff's room with other upperclassmen when plaintiff was not present, opened her underwear drawer, and made comments regarding the relative breast sizes of plaintiff and her roommate. Plaintiff offered only hearsay testimony that the event occurred. This court, therefore, orally granted summary judgment on this allegation for lack of any admissible evidence.

In each of the preceding incidents, plaintiff alleged that defendants used their authority as upperclassmen to some degree. That is, they relied on the basic power of an upperclassman to direct the activities of freshmen and to require the freshmen to stand at attention. However, the events alleged all violate official written school policy. The relevant rules and policies are discussed in detail below.

As plaintiff acknowledged in her various depositions, she was aware that the upperclassmen were engaging in prohibited activities in each instance.[9] Plaintiff reported some of these incidents at the time they occurred (the Anderson cardboard and Saleeby "boxer shorts" incidents). In most cases, however, she did not report the incidents until just before she withdrew from the school in December 1996. Plaintiff asserts that she did not report most incidents of alleged harassment for fear that defendants and other upperclassmen would retaliate by increasing their harassment of plaintiff. There is evidence in the record from which a jury could conclude that this concern was reasonable. Plaintiff

also believed that the punishment previously dispensed for the incidents she reported had been inadequate.

The school disciplined Anderson for the cardboard incident by restricting him to campus for some period of time and by requiring him to "walk tours."[10] Cadets, including Saleeby, were reminded of the proper rules of attire after plaintiff reported that Saleeby had come into her room clad only in shorts.

Plaintiff's later reports of harassment or hazing by Saleeby and Anderson and other students resulted in significant investigations and punishments by the school. A number of cadets, including these defendants, were effectively placed on house arrest during the investigations. Defendant Saleeby faced a commandant's board and was suspended from the school for one year. Defendant Anderson resigned from The Citadel rather than face a commandant's board. His resignation precludes his return to the school.

### Gender Motive Evidence

During the first oral argument on the summary judgment motions of numerous parties, it became clear to this court that the various allegations against the numerous defendants were not adequately delineated. The court, therefore, asked plaintiff to submit an outline which, *inter alia,* individually described each of her allegations of harassment at The Citadel and explained what evidence connected each defendant to any given allegation. The court also requested a specification of all

---

9. In one of her depositions, plaintiff conceded she knew she did not have to obey illegal orders and that she could have walked out when faced with a threatening incident. Pltf depos, (December 1998) at 194–95. She also knew the fire incident was more serious than the cardboard incident. *Id.* at 196. Nonetheless, she felt that reporting the fire incident would not have insured that such an event would never happen again because she was fearful of retaliation and because she felt Anderson had received too light a punishment for the cardboard incident.

Plaintiff's recent affidavit relating to the state actor issue also supports this conclusion, as plaintiff concedes that she was aware that any order to open her lock box was in violation of school rules. As noted above, the court has not allowed plaintiff to amend her allegations or factual record at this time to raise these new allegations, but will consider the affidavit only as it relates to the state actor issue. *Supra* note 7.

10. "Walking tours" is a form of punishment that involves marching in a set pattern for a specified period of time.

evidence showing gender-based motivation on a defendant-by-defendant basis.

Plaintiff subsequently filed a detailed chart summarizing this information and attaching all supporting evidence. In these submissions, plaintiff primarily relied on a single short and general statement from her own deposition to support her suggestion that she was harassed *because of her gender.* Specifically, in a deposition in a related matter, *Mellette v. Jones,* C/A 2:93–488–2 (D.S.C.), plaintiff testified that a number of cadets told her she "didn't belong" at The Citadel. Pltf Chart, Exhibit 10C (Pltf depos (*Mellette*) at 179). The cadets listed included "Batson, Amhaus, Spruills, Anderson, [and] Bohm." *Id.* While it may be debatable whether such a generic statement is adequate evidence of gender bias, this court has presumed, for present purposes, that it is.

There is at least some suggestion of other animus evidence as to Anderson. According to an FBI report of a statement given by Anderson, he "was concerned at the beginning of the school year when he found out that female cadets would be allowed to attend The Citadel. Anderson was concerned that the females would disrupt the atmosphere of The Citadel. Anderson made it a point to have very little contact with the female cadets because he felt they were nothing but trouble." [11]

Plaintiff's generic statement that numerous cadets told her that she did not belong at The Citadel does not include any reference to Saleeby. By contrast, there is uncontradicted evidence that Saleeby, at various times, took action beneficial to plaintiff. In early September, when plaintiff first experienced the pain in her pelvic area, she "approached ... Saleeby because the pain was just unbearable." Saleeby asked if plaintiff could run down the stairs (as required of freshmen) to get back to her room. When plaintiff said she could not, Saleeby walked her down to her room "so nobody would give [her] a hard time." As plaintiff recalls, Saleeby also got her some ice that night. Pltf depos (*Mellette*) at 48–49. Saleeby also gave plaintiff permission to go to the infirmary. Plaintiff concedes that Saleeby did not give her "a hard time" about the situation. Pltf depos (*Mellette*) at 50.

While Saleeby did not expressly encourage plaintiff to remain at The Citadel, he did tell her that if she stayed through Christmas, he would give her a memento (apparently an item of cadet insignia) that was passed down through the years between cadets who were from Charlotte. Pltf depos (*Mellette*) at 141. Plaintiff, like Saleeby, was from the Charlotte area, and it was now his turn to pass on the memento. Pltf depos (*Mellette*) at 141. Plaintiff testified that her relationship with Saleeby never soured, although she lost respect for him due to his actions, such as coming into her room in what she believed were boxer shorts and his presence during other incidents she felt were improper. Pltf depos (*Mellette*) at 142. Plaintiff also testified that Saleeby checked on a fellow female freshman, Kim Messer, several times when she left the mess hall ill. Pltf depos, (*Mellette*) at 247. Someone, possibly Saleeby, followed up to insure plaintiff was okay on a similar occasion. Pltf depos (*Mellette*) at 247.

In her deposition in this action, plaintiff conceded that, with the exception of the fire incident, Saleeby's actions towards her were just playful harassment. Pltf depos (December 1998) at 168. From the beginning, she felt "that [Saleeby] was a professional cadet." *Id.* The fire incident "was out of character for him." *Id.*

Various statements in the FBI's summary of Saleeby's FBI interview also sug-

---

11. The FBI agent's summary of Anderson's statements obviously presents hearsay concerns. Nonetheless, for purposes of the present motion, the court has presumed this evidence might be admissible against the moving party. No objections to the form of the submission have been raised.

gest he held a generally positive view of the female cadets. Specifically, Saleeby stated that before cadre, he and another cadet discussed the fact that having the women in their unit would be a good learning experience. In the beginning, Saleeby felt plaintiff was one of the best knobs he had ever seen. By the end of her stay, however, he felt she was only average. After observing four female cadets during cadre, he concluded that the other three would "make it," but plaintiff might not because she seemed to be there only because her father made her attend The Citadel.[12]

## FACTS REGARDING STATE ACTOR STATUS

### The Citadel and Fourth Class System

Critical to resolving the present motion is an understanding of the nature of The Citadel experience. The official policy of the school is contained in a number of written manuals, including the "Blue Book," which is provided to all students. The version provided to plaintiff and in effect during her freshman year was the 1996 Blue Book (hereafter "Blue Book").

While Citadel staff and administration retain ultimate authority for the operation of this military style system, day-to-day functioning is dependent on the cadet chain of command. Indeed, many of the benefits of the military training model derive from this delegation of authority. The greater responsibilities under the system go to the more senior students, who are supervised and mentored by staff or active duty military personnel assigned to the school. These more senior students, in turn, mentor and supervise those students below them.

The school operates on a military model, with an adversarial training system. Blue Book, Chap. 2 (Command, Control and Organization). All students wear uniforms and are subject to extensive military style rules and living conditions. Freshmen, in particular, are subjected to a fairly extreme set of disciplinary and behavioral rules under what is referred to as the "Fourth Class System."

A. GENERAL. The Fourth Class System at The Citadel is singularly unique in its evolution, traditions, implementations, and purpose. The Fourth Class System is the cornerstone of the military lifestyle which surrounds each Citadel Cadet. Its evolution has been natural within an institution whose mission of The Corps of Cadets has changed little since its inception: "To educate male undergraduates as members of The South Carolina Corps of Cadets and to prepare them for post-graduate positions of leadership through academic programs of recognized excellence supported by the best features of a disciplined military environment."

Blue Book, Chap. 16. Clearly, with the admission of women to The Citadel, this mission was modified to include female undergraduates. There is no evidence that the mission has otherwise been modified.

"The Fourth Class System at The Citadel requires strict and unquestioning obedience, mental and physical toughness, and mature tolerance of confrontation and is an intense, high-stress experience designed to facilitate development of 'The Whole Man.'" Blue Book Chap. 16.B. The "Whole Man" concept is "designed to produce excellence in four areas: academics, military, physical fitness and moral, ethical, and spiritual growth." Blue Book, Chap. 16.C. While the program is restrictive, the written policy requires implementation in a manner that "support[s] each cadet's requirement to achieve academic excellence" and prohibits use of the system to "inter-

12. As noted above regarding the Anderson FBI interview summary, the court would normally have concerns regarding the hearsay status of this document. Here, however, the document was offered by plaintiff in opposition to defendants' motion for summary judgment. Neither side objected to the form of the evidence.

fere with a cadet's right to adequate sleep and food." Blue Book, Chap. 16.D.2–3.

Freshmen must come to attention whenever an upperclassman enters their barracks or speaks to them. Blue Book, Chap. 16.I.2.f. & 3.d. Freshmen are allowed only very limited, formal responses to upperclassmen: "yes Sir;" "no Sir;" "no excuse, Sir;" and "request permission to make a statement, Sir." Blue Book, Chap. 16.G.1. When outside their own room or classroom, they are generally required to move briskly (walk at 120 steps per minute) or to stand at attention. Blue Book, Chap. 16.I.2. f, g & I.; Chap. 16.I.3.b & d. Freshmen are prohibited from using a number of common areas. Blue Book, Chap. 16.I.5.a–f. The freshmen are required to spend time in drill and in performing company details such as cleaning the common areas of the barracks. Blue Book, Chap. 16.J.1–7. They are required to follow detailed and restrictive procedures at meals and to memorize and recite certain factual information at meals and other times. Blue Book, Chap. 16.I.4. a–n & L.1–3.

In addition to the official rules, which make life as a Citadel freshman unusually restrictive for a college student, it is apparently not at all uncommon for upperclassmen to mildly harass freshmen either verbally or by requiring the freshmen to engage in an activity not of the freshman's choosing (e.g., spending long periods of time polishing a given item). Nonetheless, the school expressly prohibits any action that might be deemed hazing or abusive treatment of freshmen:

H. Violations of the Fourth Class System

1. Hazing. Hazing is a violation of the South Carolina State Law and Citadel Regulations and is punishable by expulsion from The Citadel. Hazing is defined as striking, offering bodily harm, treating with violence, verbal abuse or any treatment of a tyrannical, abusive, or humiliating nature by a member of a higher class to a member of a lower class. Hazing includes requiring performance of personal service or humiliating verbal abuse.

2. Other major violations of the Fourth Class System on the part of upperclassmen, which may not constitute hazing, are considered serious offenses and are punished in accordance with Annex B.

3. All violations of the Fourth Class System are reported immediately. Hazing and major violations of the Fourth Class System are reported to the Commandant within one hour of its discovery, regardless of the time of day.

Blue Book, Chap. 16–H.1–3. See also Blue Book, Chap. 16.J.7. (also prohibiting requiring freshmen to perform tasks of a personal nature for upperclassmen); Chap. 16.G.3. (prohibiting touching without permission and allowing touching only to provide correction and only in an open area in full view of at least one other cadet); & 16.G.4. (allowing freshmen to "focus exclusively on academics" while attending class and during published study periods).

The Blue Book provides as follows regarding contact with freshmen:

K. Contact with Fourth Classmen.

\*     \*     \*     \*     \*     \*

2. Training, counseling, and inspecting fourth classmen is restricted to the chain of command. Correcting and reporting fourth classmen is the responsibility of all cadets and officers associated with The Citadel who may observe an infraction of the part of a fourth classman.

Blue Book, Chap. 16.K.2.

Ultimate responsibility for enforcement of the fourth class system rests on the Commandant, although day-to-day functioning is overseen by the Cadet Regimental Commander, a cadet senior. Blue Book, Chap. 16.F.1–2. Active duty military officers assigned to the school are also

"responsible for teaching, advising, and mentoring cadet leaders as they implement the Fourth Class System." Blue Book, Chap. 16.F.3. An army officer was assigned to plaintiff's company in such a supervisory role. "All personnel have an obligation to report any Fourth Class System violations to an appropriate authority." Blue Book, Chap. 16.F.4. Freshmen also have formal rights to appeal their treatment as freshmen. Blue Book, Chap. 16.M.

The school expressly prohibits discrimination on the basis of gender and various other impermissible criteria. Blue Book, Chap. 1.H.1–6. The Blue Book provides extensive guidance as to what is considered sexual harassment and provides a variety of means for handling complaints. Blue Book, Chap. 1.H.1–7. Training was given to the higher ranking cadet officers prior to the arrival of the female students to insure the anti-discrimination policy was disseminated.

Formal discipline as to any infraction of any school rule is accomplished through a system of reporting violations using "performance reports." Blue Book, Chap. 6.G. Performance reports may be "submitted by an officer of The Citadel Faculty or Staff, cadet rank holders, members of the Cadet Guard, and by any cadet on himself, when directed by proper authority." Blue Book, Chap. 6.G.1. However, the Commandant retains primary responsibility for administering the disciplinary system. Blue Book, Chap. 6.A.2.

Performance reports for improper conduct are forwarded to the Commandant's office for recording, then to the offending cadet who may either acknowledge the offense or submit a written explanation and forward the document to the company commander. Blue Book, Chap. 6.G.2.c. The company commander may note the punishment for a class III offense (class III offenses all have assigned punishments, Chap. 6.E.1.c.) or recommend pun-

ishment for certain other offenses. Blue Book, Chap. 6.G.2.d. The ultimate punishment decision is, however, made by the Commandant or Assistant Commandant except as to the most minor rule infractions. See Blue Book, Chap. 6.G.2.e.

### Findings of Fact as to State Actor Status

Defendants Saleeby and Anderson were both upperclassmen in Echo Company to which plaintiff was assigned. Both were juniors and held the rank of sergeant in the fall of 1996. At no time was defendant Anderson in plaintiff's direct chain of command. Defendant Saleeby was in plaintiff's chain of command during the first portion of her training known as "cadre." During this period, he served as plaintiff's squad leader. Although Saleeby later moved from plaintiff's direct chain of command, plaintiff still perceived him as someone with particular authority over her due to his earlier position of direct authority. Some of the events alleged as to Saleeby may have occurred during the cadre period.[13]

Plaintiff was required by official school policy to come to attention when Saleeby, Anderson or any other upperclassmen entered her room or spoke to her. She was allowed to answer them only with the limited responses allowed freshmen in addressing upperclassmen. See supra, Fourth Class System.

Plaintiff was aware that certain forms of harassment were prohibited by official school policy. She was aware that each of the actions now alleged falls within the prohibited actions. She was aware of her options to report improper actions and to refuse to obey an unlawful order.

Nonetheless, there were potential negative consequences to either behavior, of which plaintiff was also aware. Refusal to obey an order could only be undertaken at the risk of disciplinary action in the event

---

**13.** Plaintiff alleges that the Saleeby–Bohm fire incident occurred in early or mid-October.

The cadre period ran through October 12, 1996.

the ultimate authority concluded the order was not improper. Given the uniqueness of the system, the average freshman could be expected to have some difficulty discerning the lawfulness of many orders. Most or all of the alleged instances of harassment still at issue in this action, however, were known to plaintiff to be unlawful.[14]

Certainly reporting harassment or refusal to obey questionable, if not clearly invalid, orders risked an increase in pressure and punishment by upperclassmen in general and the offending upperclassman in particular. In a Fourth Class System such as The Citadel's, which emphasizes class unity, peer pressure is particularly significant and might also be negatively affected by failure to "go along."

The court, therefore, finds that the moving defendants had at least some measure of authority over plaintiff by virtue of the system created and sanctioned by The Citadel, a state institution. Their authority, however, was limited to that of any given upperclassman in her company, except as to Saleeby during the cadre period. The specific allegations at issue, however, are not of a type as to which Saleeby's particular authority as squad leader would be relevant.

While limits were imposed by the system and plaintiff had options in responding to improper behavior, the system itself enhanced the likelihood plaintiff would be discouraged from reporting violations and would suffer some negative result from exercising her options to report harass-

ment. Nonetheless, it is quite clear that the school did not endorse or encourage abuses of the fourth class system and, in fact, endeavored to discourage abuses of the type alleged by plaintiff.

The very abuses plaintiff alleges as to the present defendants were punished or adequately addressed when brought to the school's attention. Plaintiff reported the Anderson cardboard incident when it occurred. Anderson was punished. When plaintiff raised concerns that males (including Saleeby) were wearing boxer shorts in view of the female cadets, the cadets were reminded of the need to dress appropriately.[15] While more severe sanctions could have been imposed in either case, the school had many factors to consider, including the risk of hindering the assimilation of women if the school overreacted. This court concludes, therefore, that the discipline imposed and responses given were within a reasonable range of discretion to preclude any inference that the school endorsed or condoned the alleged behaviors.

The plaintiff's December 1996 reports as to other allegations of abuse also led The Citadel to impose serious, if not severe, sanctions. While the school's response to plaintiff's December reports necessarily did not occur until after plaintiff left the school, it evidences the fact that the school did not condone the behaviors at issue. Perhaps most telling is the fact that several cadets involved in the alleged instances of harassment (including Anderson) re-

---

**14.** Plaintiff's early reports of the cardboard incident and the "boxer" short incident demonstrate this knowledge. She was also clearly aware that touching or threatening harm was unlawful. In short, only the allegations of different disciplinary treatment by Anderson in regard to the Thanksgiving drinking incident might raise issues relating to plaintiff's knowledge of the propriety of any action by an upperclassman still at issue in this action. Even that is doubtful given the school's clear rules regarding gender discrimination. At most, plaintiff was uncertain whether the school would believe her version of events: that she was treated differently than male cadets under similar circumstances.

**15.** As noted above, it is now evident that Saleeby did not wear the boxer shorts when entering plaintiff's room. He did, however, appear without a shirt which also violated school rules. While a violation of rules, it was a relatively minor infraction, and the court cannot say that more than a reminder was called for. Plaintiff concedes no further incidents relating to improper apparel occurred involving Saleeby.

signed, rather than face a commandant's board. This strongly suggests that these cadets were well aware that the incidents of alleged hazing would not be treated lightly.

The court, therefore, finds as to the state actor issue that the alleged actions of defendants Saleeby and Anderson fall clearly within the categories of harassment that are expressly prohibited by the official written policy of the school. The court further finds that the school's actual enforcement of its official policies relating to the Fourth Class System was adequate to preclude any finding that the school endorsed or encouraged any contrary informal policy. The court does not suggest any conclusion as to whether the school's enforcement of its official policies were adequate for any other purposes.[16]

Finally, the court finds that while the Fourth Class System established by the school has known risks of abuse, as well as disincentives to reporting any abuse, these risks are inherent in the unique educational opportunity offered at The Citadel. To require that the risks be eliminated would be to eliminate the very system of education on which the school is based. This is not to say that the risks can be ignored. However, if the school makes genuine and reasonable efforts to minimize the risks, it cannot be said to endorse the abuses that might result.

The court finds that the school was well aware of the risks and the history of abuse of the Fourth Class System. The court finds, however, that the school had made efforts to manage the risks by placing final disciplinary control with the Commandant and staff, by creating a variety of methods to report violations, by imposing numerous requirements for immediate reporting of

alleged abuse, and by imposing adequate punishments for reported abuses when established. The numerous provisions of the Blue Book cited above, various reports commissioned by the school, and positions taken publicly by the administration support these conclusions. *See, e.g.,* Defendant's Exhibit 4 "Commandant's Notes" (article by Colonel Trez discussing concerns with Fourth Class System, various prior studies, and ongoing efforts to retain the benefits of the fourth class system while ending any abuses).

## DISCUSSION

Plaintiff's remaining Section 1983 claim alleges that defendants Saleeby and Anderson violated plaintiff's rights under the Fourteenth Amendment. The Fourteenth Amendment, like most constitutional amendments, only limits actions by governmental entities. *See, e.g., Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 936, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). Therefore, plaintiff must not only prove that the actions were undertaken under color of state law, but also that defendants' actions constituted action by the state. *Id.* at 935 n. 18, 102 S.Ct. 2744 (discussing the relationship between the color of law and state actor requirements). The analysis of the state actor issue begins with the presumption that college students are generally not state actors. Plaintiff argues, however, that the cadets became state actors by virtue of the special role played by upperclass cadets at The Citadel.

The Supreme Court set out a three step analysis for determining state actor status in *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). In *Blum,* the Court declined to find that a private nursing home was a state actor as

---

16. This court is not making a finding as to whether the school's efforts to prevent abuse were ideal or even adequate for any purposes beyond the state actor determination. The court does not find it necessary to resolve the broader questions for purposes of the present order. To resolve them, the court would need to consider numerous issues of fact including

whether the school actively discouraged students from seeking redress beyond the school's own system (such as by reporting abuse to outside sources), if the student subjectively questioned the school's enforcement efforts or otherwise determined that allegations of abuse should be made public.

to its decisions to discharge or transfer Medicaid patients, despite the fact that the home received significant state funding and was subject to extensive regulation. The *Blum* standard was recently summarized by the Fourth Circuit Court of Appeals as follows:

> The Supreme Court has identified three situations in which particular conduct by a private entity constitutes "state action." *The first situation is the symbiotic relationship and occurs when there is "a sufficiently close nexus between the state and the challenged action of the regulated entity such that those actions may be fairly treated as those of the state.* The inquiry is whether the state is responsible for the specific conduct of which the plaintiff complains." ... The second situation involves extensive governmental regulation of a private entity: "a state may be held responsible for private conduct only when it has exercised coercive power or has provided such significant encouragement that the action must in law be deemed to be that of the state." ... *The final situation occurs when "the private entity exercised powers that are traditionally the exclusive prerogative of the state."* Relevant to all three situations is the level of governmental funding the private entity receives, although "[r]eceipt of state funds [alone] is ... insufficient to transform ... private actions into state action." ... The Supreme Court, when addressing the extent to which state regulation will convert private actions into state actions has held on numerous occasions that the regulatory scheme must impact directly the alleged constitutional violation.

*Haavistola v. Community Fire Co. of Rising Sun, Inc.* 6 F.3d 211, 215 (4th Cir. 1993) (emphasis added). The Fourth Circuit also noted that "the Supreme Court has limited the symbiotic relationship analysis ... '[to] lessees of public property.'" *Id.* at 215. *See also Beverley v. Douglas*, 591 F.Supp. 1321, 1329 (S.D.N.Y.1984) (neither state regulation nor funding are

alone enough to support a finding of state action) (quoted in *Haavistola*, 6 F.3d at 214–15). In the case of a regulated entity, "the inquiry must be whether there is a sufficiently close nexus between the State and *the challenged action* of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) (emphasis added) (simply because utility was heavily regulated and held a partial, governmentally protected monopoly was not sufficient to support finding of state action).

Plaintiff relies on two of the tests discussed in *Blum* and *Haavistola:* the close nexus test and the exclusive state function test. These tests are discussed separately below.

### 1. Exclusive State Function Test

Plaintiff argues that The Citadel is engaged in an exclusive state function because it is in the business of providing military training akin to that provided by the service academies: West Point, the Naval Academy, and the Air Force Academy. Specifically, plaintiff relies on the fact that the doctrine first announced in *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950) has been applied to the students at these service academies. *See Collins v. United States*, 642 F.2d 217, 220–21 (7th Cir.) (*Feres* doctrine applies to cadets at United States military academies), *cert. denied*, 452 U.S. 964, 101 S.Ct. 3115, 69 L.Ed.2d 975 (1981). The *Feres* doctrine bars members of the military services from bringing claims against the government under the Federal Tort Claims Act for service related injuries. *Collins*, 642 F.2d at 219.

Plaintiff supports her argument that The Citadel is in the same business as the military academies in part by reliance on the fact that The Citadel is one of only six colleges in the United States designated as a "Senior Military College." 10 U.S.C.

§ 2111a(f). This designation provides special accommodations for the appointment of active duty military officers to serve in a variety of positions, including tactical officers or commandant of cadets. 10 U.S.C. § 2111a(a)–(c). The graduates of the Reserve Officer Training Corps ("ROTC") programs at these six colleges are guaranteed active duty assignments if they so desire and are otherwise qualified. 10 U.S.C. § 2111a(e).

One of the six colleges accorded this special designation, Norwich University, is a private university. Another, Virginia Military Institute, offers a program quite similar to The Citadel, as both have only military students in their primary (day) programs. The remaining schools appear to offer both civilian and military education in a combined setting. The United States Supreme Court has stated that the goal of Virginia Military Institute is the production of "citizen soldiers." *See United States v. Virginia*, 518 U.S. 515, 520, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) ("VMI's distinctive mission is to produce 'citizen-soldiers,' men prepared for leadership in civilian life and in military service.")

Plaintiff's analogy to the service academies is misplaced. Students at the service academies are, in fact, military personnel who incur a service commitment in exchange for their education. *E.g., Collins*, 642 F.2d at 220–21; 10 U.S.C. § 8075(b)(2) (Air Force Academy cadets included as members of the Air Force); 10 U.S.C. § 6959 (addressing service obligation of Naval Academy midshipmen); 10 U.S.C. § 802(2) (academy cadets are subject to discipline under the Uniform Code of Military Justice). The *Feres* doctrine applies to service academy cadets because they are, in fact, members of the relevant military branches. *Collins*, 642 F.2d at 220–21.[17]

While The Citadel bases its educational experience on a military model, the comparison to the academies ends there. The education is no more at government expense than at any other state supported college. Neither do Citadel students incur a service obligation simply because they attend The Citadel. Most significantly, Citadel cadets are not members of the armed forces, unless they are members of the reserve as a consequence of signing a contract in an ROTC program.[18] In that regard, Citadel cadets stand in no different position than an ROTC student at any other college, whether state or private. *See Wake v. United States*, 89 F.3d 53, 55–56 (2d Cir.1996) (*Feres* doctrine barred Naval ROTC student from suing the government for injuries sustained while traveling under orders for the purpose of taking her entrance physical because the injury occurred in connection with her service).

Certainly, The Citadel uses a military model that more closely resembles life at a service academy than life at most college campuses—even those offering ROTC programs. The Citadel is not, however, primarily in the business of training military officers. Its mission is the production of "the whole [person]," not the production of citizen-soldiers. Thus, its stated goal is dissimilar to VMI's mission as quoted by the United States Supreme Court above. In any case, no showing has been made that even VMI's mission statement would cause it to be treated as the equivalent of a military academy.

17. This court is not determining that the application of the *Feres* doctrine is synonymous with a determination of state action or even that it provides any particular guidance on the present issue. Such a determination is unnecessary in light of the conclusion that The Citadel is not the equivalent of a military academy.

18. All cadets at The Citadel are required to attend ROTC classes during all four years at the institution. Nonetheless, they are *not* required to sign an ROTC contract. Only those who make such a commitment are considered as enrolled in ROTC from the perspective of the United States government. Ultimately, only about one third of Citadel cadets actually sign an ROTC contract and accept a commission in the military.

Plaintiff's theory equating The Citadel to a service academy is also troubling in that this court can see no significant distinction between what The Citadel does and what many private secondary schools do: using a military model as a basis for instilling discipline and providing leadership training. Under plaintiff's theory, every high school military academy would be engaged in an "exclusive state function." The long standing prevalence of such private institutions, demonstrates the non-exclusivity of military model training. Indeed, it would appear that most high schools based on a military model are private institutions, although Junior ROTC is offered at a number of public schools as a component of the educational offerings. In short, education and training based on a military model are not historically an exclusive state function. This is further confirmed by the fact that one of the six "Senior Military Colleges" is a private institution.

Plaintiff's reliance on *Alton v. Texas A & M University*, 168 F.3d 196 (5th Cir. 1999) for the proposition that upperclass cadets have been presumed to be state actors in their interactions with lower class cadets is misplaced. It does not appear that these issues were ever raised in *Alton*. Rather, the Fifth Circuit noted only that "the student cadet leaders ... were *arguably* acting under color of state law" while it was undisputed that "the defendant officials are state actors." *Id.* at 199 (emphasis added). In *Alton*, only the claims against the officials were at issue on appeal. The Fifth Circuit expressly declined to decide whether the students were even acting under color of state law, given its disposition of the case on other grounds. *Id.* at 200. As noted in *Lugar v. Edmundson Oil*, a greater showing is required to demonstrate state actor status

than to demonstrate action under color of state law. 487 U.S. at 935 n. 18, 108 S.Ct. 2751. Thus, *Alton* offers no guidance on either the state actor or lesser color of state law requirements.

Likewise, *Morse v. Regents of the University of Colorado* does not support plaintiff's suggested conclusion that a senior cadet is a state actor in regard to interactions with subordinate cadets. 154 F.3d 1124 (10th Cir.1998). The *Morse* court merely held that it was "reasonable to infer that because the student was a superior cadet he exercised some measure of authority" over lower ranking cadets. *Id.* at 1128. This finding, made in the context of a Title IX case, is a far cry from a state actor determination for Section 1983 purposes.[19]

By contrast, cases actually addressing the state actor issue appear to have consistently held that student actions are not state actions merely because the student serves in some role authorized by the state and exercises the powers inherent in that role. *See Yeo v. Town of Lexington*, 131 F.3d 241, 248–51 (1st Cir.), *cert. denied*, 524 U.S. 904, 118 S.Ct. 2060, 141 L.Ed.2d 138 (1998) (student editors' decision not to accept newspaper and yearbook advertisements was not state action where students were given autonomy to make the decisions at issue, even though they had faculty guidance); *Indorato v. Patton*, 994 F.Supp. 300 (E.D.Pa.1998) (football player who struck referee during game was not state actor, despite the fact that he received a scholarship, liability insurance, and uniform at the school's expense and was subject to various rules laid down by the school and various sports organizations in connection with his varsity status).

In any case, plaintiff's theory would prove too much. If the cadets were, effec-

---

19. The alleged harassment in *Morse* went far beyond the cadet as it was "exacerbated and perpetuated by ... an ROTC instructor," a Colonel. The Title IX claim rested on the university's failure to respond appropriately to these allegations and allegations of retalia-

tion for reporting the harassment to university representatives. Thus, whether the offending cadet's actions were actions of the university, the ROTC department, or simply a fellow student, was of little legal consequence.

tively, military trainees, they would likely be barred from pursuing damages claims against their superiors under the Supreme Court's decision in *Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983). In *Chappell,* the Court held that enlisted members of the Navy could not sue their military commander for damages for constitutional violations. *Id.* at 305, 103 S.Ct. 2362. The Court wrote: "The special nature of military life, the need for unhesitating and decisive action by military officers and equally disciplined responses by enlisted personnel, would be undermined by ... exposing officers to personal liability at the hands of those they are charged to command." *Id.* at 304, 103 S.Ct. 2362; *see also Introini v. South Carolina National Guard,* 828 F.Supp. 391, 393 (D.S.C.1993) (applying *Chappell* to bar claim by National Guard member against superiors for alleged retaliatory discharge and noting that "it appears that every court of appeals that has addressed this issue since *Chappell* ... has held that a member of the National Guard may not sue his military superiors ... under § 1983").

Plaintiff seeks to distinguish *Chappell* and *Introni* by arguing that "[n]either the defendants nor the plaintiff in this case were in the military or serving in the National Guard at the time of the challenged acts." Plaintiff's November 30, 1999 memorandum at 5. This is, of course, a correct factual statement and the very reason this court rejects plaintiff's analogy to the service academies and her reliance on the *Feres* doctrine as applied to academy cadets. This court does not rely on

*Chappell* and *Introni* except to demonstrate additional difficulties with the service academy analogy. That is, *if* The Citadel *were* the equivalent of a service academy such that the *Feres* doctrine would apply to the students in their non-ROTC activities, *Chappell* and its progeny would likely bar relief.[20]

This court concludes that The Citadel is in the business of providing a post-secondary education with a goal of assisting students to achieve a well-rounded development in all spheres of life and with an emphasis on leadership training. That the school seeks to achieve these goals through a military model may make its system of training fairly unique. It does not, however, convert the primary business of The Citadel into that of producing military officers. It is beyond dispute that providing post-secondary education is not traditionally an exclusive state function. *See, e.g., Rendell–Baker v. Kohn,* 457 U.S. 830, 842, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (while providing *high school* level education is a public function, it is not traditionally the *exclusive* province of the state). Neither is the use of a military model or education historically limited to public schools. This court must, therefore, conclude that the exclusive state function model does not provide a basis for finding defendants to be state actors.

**2. Close Nexus Test**

As the United States Supreme Court recently emphasized, there are two critical steps to proving state action. *American Manufacturers Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 119 S.Ct. 977, 143 L.Ed.2d 130

---

**20.** The Supreme Court recently held that the qualified immunity defense was not available to private parties in two specific circumstances involving Section 1983 claims. *Richardson v. McKnight,* 521 U.S. 399, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997) (private prison guards who have been held to be state actors are not entitled to qualified immunity from Section 1983 liability for actions directed towards prisoners); *Wyatt v. Cole,* 504 U.S. 158, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992) (private parties who conspire with state officials are not entitled to qualified immunity from Section 1983 liability for invoking state replevin, garnishment or attachment statutes). In both cases, the Court emphasized the need to determine the availability of immunity with specific reference to the historical role of the state in carrying out the function at issue. If qualified immunity does not follow a state actor determination as to a private party, then the "superior officer" immunity also may not follow, although this result is far from certain, given the specificity of the inquiry.

(1999) (applying nexus test). First, plaintiff must show that the alleged "constitutional deprivation [was] caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible." *Id.* 526 U.S. 40, 119 S.Ct. at 985 (internal quotations omitted). Second, "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Id.* (internal quotations omitted).

The "state actor" inquiry "begins by identifying the specific conduct of which the plaintiff complains." *Id.* (internal quotations omitted). In cases involving extensive state regulation, the court must determine whether "there is a sufficiently close nexus between the State *and the challenged action* of the regulated entity so that the latter may be fairly treated as that of the State itself." *Id.* 526 U.S. 40, 119 S.Ct. at 986 (internal quotations omitted) (emphasis added). Whether an adequately " 'close nexus' exists ... depends on whether the State has exercised *coercive power* or has provided such *significant encouragement,* either overt or covert, that the choice must in law be deemed to be that of the State." *Id.* 526 U.S. 40, 119 S.Ct. at 986 (emphasis added) (internal quotations omitted).[21]

In *American Manufacturers,* the Court ultimately concluded that private insurers who withheld payments for disputed medical treatments under the authority of provisions of the state's workers compensation law were not state actors. *American Manufacturers,* 526 U.S. 40, 119 S.Ct. at 986. The Court reasoned as follows: (1) the state law authorized, but did not require withholding; (2) the decision to withhold payment was made by private parties; and (3) the decision turned on judgments made by private parties without standards established by the state. *Id.* 526 U.S. 40, 119 S.Ct. at 986 (citing *Blum* ).

The Court expressly rejected any argument that the state had authorized or encouraged denials by granting a new option to insurers in how they handled denials. The Court held that such "subtle encouragement is no more significant than that which inheres in the State's creation or modification of any legal remedy," which was simply not enough. *Id.* 526 U.S. 40, 119 S.Ct. at 986. Neither did the "State's role in creating, supervising, and setting standards for the [underlying decision] process" justify a finding of state action. *Id.* 526 U.S. 40, 119 S.Ct. at 987.

Applying the guidelines of *American Manufacturers,* this court would not find the cadet defendants to be state actors. Their actions may have been made possible by the system established by the state, but these cadets did not receive significant encouragement and did not exercise the state's coercive powers. This conclusion is supported by the additional cases discussed below.

While there seems to be no case addressing a situation similar to the one before this court, various decisions of the United States Supreme Court, the Fourth Circuit Court of Appeals and other courts of appeals addressing a variety of situations in which private actors are alleged to have become state actors provide some guidance. The United States Supreme Court has refused to treat a private school that specialized in dealing with students who had difficulties in the public schools as a state actor, despite extensive state regulation and funding. *Rendell–Baker v. Kohn,* 457 U.S. 830, 842, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (relying in part on the

---

**21.** There is some authority to suggest that the close nexus test is limited to lessees of public property. If this is a correct statement of law, this test is clearly inapplicable to the student-school relationship before this court. *See Haavistola* 6 F.3d at 214–15 (quoted *supra* ). It would also appear arguable that this test's reference to "regulated entities" is not intended to reach individuals who are participants in a state sponsored training program simply because that program "regulates" their activities. Because this court resolves the state actor issue on other grounds, it need not resolve these questions.

fact that the function of education was not traditionally the *exclusive* prerogative of the State, although it was a public function). Similarly, in *Milburn by Milburn v. Anne Arundel County DSS*, 871 F.2d 474 (4th Cir.), *cert. denied*, 493 U.S. 850, 110 S.Ct. 148, 107 L.Ed.2d 106 (1989), the Fourth Circuit held that foster parents were not state actors because "neither the contract nor the approval form provides for any kind of intimate relationship between the State and the [foster parents], nor is there any detailed guidance of the [foster parents] nor any regulation of the conduct complained of." *Id.* at 477.

The Citadel does, through its regulations, exercise significant control of the details of the cadets' lives. Upperclassmen, in turn, exercise significant control over freshman cadets' lives. A foster parent, however, has far more control over the foster child than an upperclassman has over a Citadel freshman. Moreover, while the details of day-to-day life in a foster home may not have been set out, states do provide general guidelines for foster parents, particularly in prohibiting certain activities. *See Milburn*, 871 F.2d at 477 (contract provided "only the most general guidelines for the ... foster home").

Further, unlike a cadet, a foster child is placed in the foster home on the authority of the state and may not leave without the permission of the state. *See Taylor By and Through Walker v. Ledbetter*, 818 F.2d 791, 795 & 797 (11th Cir.1987) ("child involuntarily placed in a foster home is in a situation so analogous to a prisoner in a penal institution and a child confined in a mental health facility that the foster child may bring a section 1983 action for violation of Fourteenth Amendment rights"— "in both cases, the person is unable to seek alternative living arrangements"), *cert. denied*, 489 U.S. 1065, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989).[22] A cadet is free to leave at any time, at least as far as the state is concerned. Thus, while not dispositive, the denial of state actor status to a foster parent suggests that a cadet would not normally be considered a state actor simply because the upperclass cadet may control various aspects of the freshman cadet's life. This would at least be true to the extent the cadet is acting beyond the powers expressly granted to the upperclassman by the state college's administration.

The Supreme Court has, under various circumstances, refused to extend state actor status to private schools, private nursing homes, and regulated utilities, despite receipt of government funds and the private entities' involvement in activities that are highly regulated and frequently, though not exclusively, within the province of state government. *See Blum, supra* (nursing home not state actor as to its decision to discharge or transfer medical patients); *Jackson, supra* (regulated entity not a state actor as to its decision to terminate service to customer); *Rendell-Baker, supra* (private school for maladjusted children not a state actor as to its decision to discharge employees). As discussed above, the Fourth Circuit has declined to find state action in the relationship between foster parent and foster child. The Fourth Circuit has also refused to find state actor status when county employees assaulted a fellow employee, despite the fact that they did so on county land, while on duty, in uniform, and using state supplied rope. *Hughes v. Halifax County School Board*, 855 F.2d 183 (4th Cir.), *cert. denied*, 488 U.S. 1042, 109 S.Ct. 867, 102 L.Ed.2d 991 (1989).

---

**22.** In *Taylor*, plaintiff challenged the placement decision and the state's failure to supervise the home whereas in *Milburn*, plaintiff challenged the foster parent's actions more directly. Even with this distinction, it appears the two circuits would take a different approach to the questions of state action as *Taylor* focuses on the exercise of the state's coercive power over the *child*, while *Milburn* considered whether the state has exercised coercive power over the *foster parents*. Neither focus would result in a finding of state action in this case, as students are not compelled to attend or remain at The Citadel.

The preceding cases suggest a narrow application of the nexus test. The cases on which plaintiff relies do not suggest any broader application, as these cases all involved either penal institutions or the delegation of the state's police powers.[23] Whether or not these two areas involve exclusive state functions, they clearly involve delegation of the state's coercive powers of arrest and imprisonment.[24] While a cadet may have some authority over other cadets, the power is simply not comparable to that exercised by a police official or prison warden. Even the school's own exercise of power is not so broad.[25]

It is beyond dispute that the two remaining defendants in this action exercised some level of general authority over plaintiff and that this authority existed by virtue of their status as upperclassmen under a *system* established and perpetuated by the state. Both also held some official duty relating to freshmen, with cadet Saleeby having some direct authority over plaintiff as her squad leader during cadre. Cadet Anderson may have held a similar position as to some freshmen, but plaintiff was not among these freshmen.

The state did establish the very system that, due to propensities of human natures, may lead to excesses in the use (and abuse) of power and which may discourage reporting of abuses. This alone, however, is not enough to find that the cadet defendants' actions were the actions of the state. Otherwise, every system established by the state which has some predictable abuses by private persons could potentially convert private actions into actions of the state. The Supreme Court and the Fourth Circuit cases cited above demonstrate that this is not the law. *E.g., American Manufacturers Mut. Ins. Co., supra* (workers compensation carriers); *Milburn, supra* (foster care).

It simply does not appear that the nexus here is sufficiently close as measured between the state and the *challenged action.* Each of the actions on which plaintiff's claims rest are expressly prohibited, not condoned, by the state. This is demonstrated both by official written policy, by the school's various attempts over recent years to eliminate abuse of the system, and by the school's response when plaintiff's allegations were brought to light.

This court is not determining that no action by an upperclass cadet could ever be state action. Circumstances could arise in which specific authority is delegated to a cadet, and that cadet exercises that specific delegated authority in compliance with school (state) policy, and in a way which supports a finding of state action. This court has simply concluded that this case does not present circumstances adequate

23. In her memorandum filed November 5, 1999, plaintiff cites to numerous cases in which private persons or organizations were held to be state actors. Four of these cases involved actions occurring in or relating to penal institutions. The remaining eight involved the exercise of police powers where the actors had the authority to make arrests. Plaintiff's Supplemental Memorandum in Opposition to Summary Judgment at 2, & 6–7 (filed November 5, 1999).

24. Some grounds for debate on the exclusivity may have been raised by *Richardson v. McKnight*, 521 U.S. 399, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997), in which the Supreme Court noted in a different context that the *operation* of prisons has not historically been an exclusive state function. *Cf. Conner v.*

*Donnelly*, 42 F.3d 220, 224 (4th Cir.1994) (relying on an earlier Supreme Court opinion as having "made clear ... that the provision of medical services to prison inmates is traditionally the exclusive prerogative of the state"). Many other cases cited by plaintiff involving prison related claims against private parties appear to rest on the same presumption.

25. The decision of some cadets to leave the school rather than face a commandant's board illustrates this point. The students were at all times free to leave the school. While the school might require that they remain under "house arrest" or face a commandant's board if they chose to remain at the school, it could not require them to make the choice to stay.

for a finding that defendants' actions can be deemed the actions of the state.

For the reasons stated above, this court concludes that defendants Saleeby and Anderson were not state actors as to the allegation giving rise to the claims remaining in this action. As this is a necessary element of plaintiff's remaining theory of liability, these defendants are entitled to judgment as a matter of law.

## OTHER SUMMARY JUDGMENT ISSUES

In prior hearings, plaintiff withdrew some allegations as to the money defendants and the court granted summary judgment as to all other claims against defendants Saleeby or Anderson except those set forth in the Facts section of this order. *Supra* at 612–14. As noted above, evidence has now been submitted that demonstrates that defendant Saleeby did not enter plaintiff's room in boxer shorts, although this may well have been plaintiff's perception. Defendant Saleeby is therefore entitled to summary judgment as to this allegation on this factual basis, as well as on the grounds discussed above.

To support her remaining Section 1983 allegations, plaintiff must not only prove defendants' state actor status and a constitutional injury (here deprivation of equal access to educational opportunities as guaranteed by the Fourteenth Amendment), but must also prove that any injury was caused by improper actions directed towards her *because of her gender*. The record reveals no evidence that defendant Saleeby's actions towards plaintiff were motivated by gender bias. The only evidence of record relative to Saleeby suggests the opposite motivation. Defendant Saleeby is, therefore, entitled to summary

judgment as a matter of law on this additional ground.[26]

While the evidence of gender motive as to defendant Anderson is weak, his collective actions and comments could give rise to an inference that he mistreated plaintiff because of her gender and with an intent to drive her from the school. But for the ruling as to the state actor status, jury issues would be presented as to at least two of plaintiff's three remaining allegations relating to defendant Anderson.

As noted above, plaintiff's version of the events relating to the Thanksgiving drinking incident is unclear as to whether she was with the male students when stopped by Anderson and whether the relative behavior of the males and females justified differential treatment. As plaintiff bears the burden of proof, this presents a close question as to summary judgment. Given the resolution of plaintiff's claims on other grounds, the court will not resolve this question.

## CONCLUSION

For the reasons stated above, this court concludes that defendants Anderson and Saleeby were not state actors as to the allegations against them. Both are, therefore, entitled to summary judgment as to the plaintiff's sole remaining cause of action under Section 1983. Defendant Saleeby is entitled to summary judgment on all claims for the additional reason that plaintiff has failed to present evidence that he acted with improper gender animus. He is also entitled to judgment on the allegations relating to improper apparel for lack of evidentiary foundation.

Plaintiff's claims against defendants Saleeby and Anderson are, therefore, dismissed with prejudice. All of her other claims, except as to defendant Bohm, have

---

**26.** This is by no means an endorsement of the behaviors alleged: setting fire to clothing or kicking. No matter how intended, these behaviors present a serious risk of harm. They cross the clear line that must be drawn to prevent abuse of an adversative training sys-

tem. These actions could also give rise to a state law action for assault, which is not here asserted. Nonetheless, absent evidence of discriminatory motive, plaintiff's allegations against Saleeby cannot support plaintiff's Section 1983 claim.

been resolved by settlement. The present action is, therefore, ended, except as to the damages hearing on the claims against Mr. Bohm, who is in default.

IT IS SO ORDERED.