PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JEANIE MENTAVLOS,
　　　　　*Plaintiff-Appellant,*

　　　　　v.

JOHN JUSTICE ANDERSON; JAMES
SALEEBY,
　　　　　*Defendants-Appellees,*

THE CITADEL, The Military College
of South Carolina,
　　　　　*Defendant-Amicus Curiae,*

　　　　　and

THE BOARD OF VISITORS OF THE
CITADEL, The Military College of
South Carolina; RICHARD ELLIS,
Captain; NICHOLAS BELCHER; ERIC
AMHAUS; EDWARD BOHM,
　　　　　*Defendants,*

　　　　　and

UNITED STATES OF AMERICA,
　　　　　*Intervenor-Plaintiff.*

No. 00-1331

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Joseph F. Anderson, Jr., Chief District Judge.
(CA-97-2718-3-17)

Argued: January 25, 2001

Decided: May 7, 2001

Before WILLIAMS and TRAXLER, Circuit Judges, and
Raymond A. JACKSON, United States District Judge for the
Eastern District of Virginia, sitting by designation.

Affirmed by published opinion. Judge Traxler wrote the opinion, in which Judge Williams and Judge Jackson joined.

---

**COUNSEL**

**ARGUED:** Leon Friedman, New York, New York, for Appellant. Sandra Jane Senn, SANDRA J. SENN, P.A., Charleston, South Carolina, for Appellees. Wendy Raina Johnson Keefer, BARNWELL, WHALEY, PATTERSON & HELMS, L.L.C., Charleston, South Carolina, for Amicus Curiae. **ON BRIEF:** Richard A. Harpootlian, Robert G. Rikard, RICHARD A. HARPOOTLIAN, P.A., Columbia, South Carolina, for Appellant. Stephanie P. McDonald, SANDRA J. SENN, P.A., Charleston, South Carolina, for Appellees. M. Dawes Cooke, Jr., BARNWELL, WHALEY, PATTERSON & HELMS, L.L.C., Charleston, South Carolina, for Amicus Curiae.

---

**OPINION**

TRAXLER, Circuit Judge:

Today we consider the novel question of whether two male cadets at The Citadel, a state-supported and formerly all-male military college located in Charleston, South Carolina, acted "under color of" state law, within the meaning of 42 U.S.C.A. § 1983 (West Supp. 2000), when they allegedly engaged in gender-based harassment and discrimination designed to force a female cadet to withdraw from the college. We hold that they did not, and accordingly affirm the district court's grant of summary judgment to the male cadets.

I.

The Citadel, The Military College of South Carolina, is a state-supported, four-year comprehensive college, established by the State of South Carolina in 1842. For over 150 years, The Citadel only admitted men to its full-time, residential student body known as the South Carolina Corps of Cadets. However, in the waning days of an extended legal battle over the constitutionality of the single-gender

admissions policy of the Corps of Cadets, *see Faulkner v. Jones*, 10 F.3d 226 (4th Cir. 1993) (discussing Shannon Faulkner's challenge to The Citadel's revocation of her admission to the Corps of Cadets based on her gender), and in the wake of the Supreme Court's decision in *United States v. Virginia*, 518 U.S. 515 (1996) (holding that a similar, unconstitutional male-only admissions policy at Virginia Military Institute could not be remedied with a parallel women's program at a women's college), The Citadel was forced to abandon its male-only policy and began voluntarily admitting women to its Corps of Cadets in the fall of 1996. *See United States v. Jones*, 136 F.3d 342, 345 (4th Cir. 1998).[1]

Appellant Jeannie Mentavlos was one of four women admitted to The Citadel that fall. Upon her arrival, she was assigned to Echo Company, an administrative unit of the Corps of Cadets. However, she withdrew from the college in December 1996. Mentavlos contends that during those four months the commanding administrative officer and several upperclass cadets assigned to Echo Company successfully conspired to perpetuate the former all-male Corps of Cadets by driving her from the school. Mentavlos further asserts that, to accomplish this result, the men subjected her to "sexual harassment, intimidation, and abuse" in the form of "insults, indignities, physical assaults and humiliating treatment, which went far beyond any need to toughen, strengthen or acclimate [her] to the rigors of military discipline." J.A. 25-26.

The following year, Mentavlos instituted this action against The Citadel and its governing Board of Visitors; Captain Richard Ellis, the army officer assigned to act as the commanding administrative officer of Echo Company; and five upperclass cadets assigned to Echo Company, including Appellees John Justice Anderson and James Saleeby. Among other claims, Mentavlos alleged that the actions of Ellis and the individual cadets deprived her of her constitutional right to equal protection in violation of 42 U.S.C.A. § 1983 and 42 U.S.C.A. § 1985 (West 1994), and that The Citadel and The Board of Visitors violated

---

[1]Faulkner, the first female admitted to The Citadel Corps of Cadets, joined the Corps on August 12, 1995, by virtue of court order, but withdrew because of illness on August 18, 1995. *See United States v. Jones*, 136 F.3d 342, 345 (4th Cir. 1998).

Title IX of the Educational Amendments of 1972, *see* 20 U.S.C.A. § 1681 (West 2000), by failing to adequately respond to the known, gender-based harassment which ultimately forced her to withdraw from the school.

With the exception of one cadet who was in default, all defendants moved for summary judgment and all but Cadets Anderson and Saleeby settled the claims against them. Although Mentavlos had originally alleged only that the upperclass cadets acted in concert with Captain Ellis, a state actor for purposes of § 1983, to abuse and harass her because of her gender, she was subsequently allowed to amend her complaint to allege that the individual cadets were also state actors and elected to proceed solely on her § 1983 claim against them. Anderson and Saleeby then moved for summary judgment on the additional ground that they did not act "under color of" state law for purposes of § 1983.

After conducting a fact-finding hearing on the state-actor issue with the consent of the parties, the district court granted summary judgment to Anderson and Saleeby on the grounds that they did not act under color of state law and, therefore, could not be held liable under § 1983 for the alleged violations of Mentavlos' constitutional rights. With regard to Saleeby, the district court granted summary judgment on the alternative ground that Mentavlos failed to prove that his actions were discriminatory in nature. *See Mentavlos v. Anderson*, 85 F. Supp. 2d 609, 628 (D.S.C. 2000). The district court then certified the case as one appropriate for immediate appeal under 28 U.S.C.A. § 1292(b) (West 1993).[2] We consented to hear the appeal.

## II.

### A.

We review *de novo* the district court's grant of summary judgment to Appellees Anderson and Saleeby. *See Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 340 (4th Cir. 2000), *cert. denied*, 121 S. Ct. 882, 121 S. Ct. 1096 (2001). Like the district court, we

---

[2]Because one cadet had defaulted, a damages hearing was still pending against him.

review the disputed evidence concerning Appellees' alleged gender-based harassment of Mentavlos in the light most favorable to her. *See Mentavlos*, 85 F. Supp. 2d at 612; *Goldstein*, 218 F.3d at 341. However, the district court's factual findings regarding the state-actor issue, made with consent of the parties, are reviewed for clear error. *See* Fed. R. Civ. P. 52(a); *Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal, Va.*, 135 F.3d 275, 284 (4th Cir. 1998). "A finding is clearly erroneous when, although there is evidence to support it, on the entire evidence the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Faulconer v. Commissioner*, 748 F.2d 890, 895 (4th Cir. 1984).

### B.

The facts of this case are exhaustively laid out in the district court's opinion. *See Mentavlos*, 85 F. Supp. 2d at 610-20. As a military college, The Citadel offers a unique educational experience to its students. Members of the Corps of Cadets are subjected to military style rules and living conditions, and Citadel freshmen in particular are subjected to a strict set of disciplinary and behavioral rules known as the "Fourth Class System." Under this system, described at length in the Cadet Regulations (the "Blue Book"), faculty and active duty military personnel assigned to the school mentor and supervise upper-class cadets, who in turn mentor and supervise those cadets below them. The Citadel expects from its cadets "strict and unquestioning obedience, mental and physical toughness, and mature tolerance of confrontation" and offers "an intense, high-stress experience designed to facilitate development of 'The Whole Man.'" Supp. J.A. 413. For example:

> Freshmen must come to attention whenever an upperclassman enters their barracks or speaks to them. Freshmen are allowed only very limited, formal responses to upperclassmen: "yes Sir;" "no Sir;" "no excuse, Sir;" and "request permission to make a statement, Sir." When outside their own room or classroom, they are generally required to move briskly (walk at 120 steps per minute) or to stand at attention. Freshmen are prohibited from using a number of common areas. The freshmen are required to spend time in drill and in performing company details such as cleaning the

common areas of the barracks. They are required to follow detailed and restrictive procedures at meals and to memorize and recite certain factual information at meals and other times.

*Mentavlos*, 85 F. Supp. 2d at 617 (internal citations omitted). Day-to-day functioning of the fourth class system is dependent upon the cadet chain of command. Specifically,

[t]raining, counseling, and inspecting fourth classmen is restricted to the chain of command. Correcting and reporting fourth classmen is the responsibility of all cadets and officers associated with The Citadel who may observe an infraction on the part of a fourth classman.

Supp. J.A. 415.

Thus, under the fourth class system, upperclass cadets are given limited authority to correct and report violations or infractions of The Citadel's rules by fourth classmen (freshmen), with day-to-day functioning overseen by the Cadet Regimental Commander, a cadet senior. However, active duty military officers assigned to the school as faculty teach, advise, and mentor cadet leaders in the implementation of the fourth class system and the ultimate responsibility for enforcement of the fourth class system rests with The Citadel Commandant, not with upperclass cadets. Formal discipline is initiated through performance reports, which "may be submitted by an officer of The Citadel Faculty or Staff, cadet rank holders, members of the Cadet Guard, and by any cadet on himself, when directed by proper authority." Supp. J.A. at 395. The cadet company commander may note the punishment for "Class III" offenses which have assigned penalties, and may recommend a punishment for certain other "Class II" offenses.[3] But, with the exception of the most minor Class III infractions, the ultimate responsibility for administering the disciplinary

___

[3]By way of example, Class III offenses include absence from class, required formation, guard mount, tours confinements, restrictions, or all-in. Class II offenses include absence from guard post or a required event (such as a parade, athletic event, drill, or mandatory meal).

system and imposing punishment rests with the Commandant or Assistant Commandant.

In contrast to this limited authority granted to upperclass cadets to correct minor infractions of school rules, the Blue Book expressly prohibits discrimination on the basis of gender or other impermissible criteria, including sexual harassment, and provides a specific procedure for reporting such complaints to The Citadel faculty. Any action that might be deemed hazing or abusive treatment of a freshman, regardless of whether it is gender-motivated, is also strictly prohibited. "Hazing is defined as striking, offering bodily harm, treating with violence, verbal abuse or any treatment of a tyrannical, abusive, or humiliating nature by a member of a higher class to a member of a lower class" and "includes requiring performance of personal service or humiliating verbal abuse." Supp. J.A. 414. Upperclass cadets are also expressly prohibited from "touch[ing] a fourth class cadet (male or female) without first asking permission and stating the specific area(s) that will be touched." Supp. J.A. 414. Even then, touching is allowed to occur only in an open area in full view of at least one other cadet and "only for the purpose of providing instruction or correcting a uniform or posture discrepancy." Supp. J.A. 414.

Anderson and Saleeby were upperclass cadets, juniors holding the rank of sergeant, assigned to Echo Company with Mentavlos in the fall of 1996. Viewing the evidence in the light most favorable to Mentavlos, the district court found that Mentavlos had produced evidence which, if believed, would show that Anderson and Saleeby were each involved in three alleged incidents of improper treatment of her during that fall. With regard to Saleeby, the district court found sufficient evidence to show that Saleeby (1) kicked Mentavlos in the legs on one or more occasions, but caused no bruising, and commented that Mentavlos "'likes to be kicked'"; (2) came into Mentavlos' room wearing only non-uniform gym shorts and shower-type shoes on one occasion, although Mentavlos did not interpret the visit as being sexual in nature; and (3) directed another cadet to set Mentavlos' sweatshirt on fire while she was wearing it on one occasion, and then used his foot to put it out before it burned her skin. *Mentavlos*, 85 F. Supp. 2d at 612-13. With regard to Anderson, the district court found sufficient evidence to show that Anderson (1) pushed cardboard into Mentavlos' face while ranting and raving at her because she smiled

while standing at attention, which left welts under her chin that lasted for one or two days; (2) may have treated Mentavlos differently from two male cadets when Mentavlos and another female cadet were caught drinking alcoholic beverages just before the Thanksgiving break; and (3) threatened Mentavlos at various times, stating that he would physically harm or kill her or her brother, who was an upper-class cadet at The Citadel. *See id.* at 613.

The district court found that upperclass cadets Anderson and Saleeby "had at least some measure of authority over [Mentavlos] by virtue of the system created and sanctioned by The Citadel, a state institution." *Id.* at 619. And, the district court found that it was not uncommon in this military-type environment for mild harassment to take place, "either verbally or by requiring the freshmen to engage in an activity not of the freshman's choosing (*e.g.*, spending long periods of time polishing a given item)." *Id.* at 617. However, the district court also found that the school recognized the risks and history of abuse of the fourth class system, had made efforts to manage those risks, and clearly "did not endorse or encourage abuses of the fourth class system." *Id.* at 619. On the contrary, the district court noted that The Citadel had, "in fact, endeavored to discourage abuses of the type alleged by" Mentavlos. *Id.*

Each of the alleged incidents involving Anderson and Saleeby would constitute a violation of the written policy of The Citadel. On this point, there appears to be no serious disagreement. Indeed, Mentavlos reported the cardboard and "boxer shorts" incidents when they occurred, resulting in Anderson being disciplined and all cadets, including Saleeby, being reminded of the rules of proper attire. Mentavlos did not voice any other complaints until just before withdrawing from The Citadel in December, in part due to a reasonable concern that the male cadets might retaliate against her with more harassment. Once reported, however, The Citadel administration conducted thorough investigations and imposed substantial punishments. Anderson and Saleeby, as well as other cadets, were effectively placed on house arrest during the investigations; Saleeby faced a commandant's board and was suspended from school for one year; and Anderson, rather than face a commandant's board, resigned from The Citadel, thereby precluding his return to the school. Consequently, the district court found that Anderson and Saleeby's abuses "were pun-

ished or adequately addressed when brought to the school's attention" and that "the discipline imposed and responses given were within a reasonable range of discretion to preclude any inference that the school endorsed or condoned the alleged behaviors." *Id.*

### III.

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or any person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C.A. § 1983. In order to establish a claim under § 1983, Mentavlos must prove two elements: (1) that Anderson and Saleeby "deprived [her] of a right secured by the Constitution and laws of the United States;" and (2) that they "deprived [her] of this constitutional right under color of [State] statute, ordinance, regulation, custom, or usage." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970) (internal quotation marks omitted).

"Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach "'merely private conduct, no matter how discriminatory or wrongful.'" *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982)); *see Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982) (holding that § 1983's requirement that a defendant act under "color of law" is treated as the equivalent to the "state action" requirement under the Fourteenth Amendment); *Haavistola v. Community Fire Co.*, 6 F.3d 211, 215 (4th Cir. 1993) (same).

> The state action requirement "reflects judicial recognition of the fact that 'most rights secured by the Constitution are protected only against infringement by governments.'" *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 (1982) (quoting *Flagg Bros. Inc. v. Brooks*, 436 U.S. 149, 156 (1978)). "This fundamental limitation on the scope of constitutional guarantees 'preserves an area of individual freedom by limiting the reach of federal law' and 'avoids

imposing on the State, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed.'" *Edmondson v. Leesville Concrete Co.*, 500 U.S. 614, 619 (1991) (quoting *Lugar*, 457 U.S. at 936-37).

*Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 658 (4th Cir. 1998).

Nevertheless, "the deed of an ostensibly private organization or individual" may at times demand to be treated "as if a State has caused it to be performed." *Brentwood Academy v. Tennessee Secondary Sch. Athletic Ass'n*, 121 S. Ct. 924, 930 (2001). Specifically, "state action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Id.* (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974)); *American Mfrs.*, 526 U.S. at 50 (when applying § 1983 to a private actor, "'the party charged with the deprivation must be a person who may fairly be said to be a state actor.'" (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)).

A determination of "whether [a private party's] allegedly unconstitutional conduct is fairly attributable to the State," *American Mfrs.*, 526 U.S. at 50, requires us to "begin[ ] by identifying 'the specific conduct of which the plaintiff complains,'" *id.* at 51 (quoting *Blum*, 457 U.S. at 1004). The inquiry is "necessarily fact-bound." *Lugar*, 457 U.S. at 939.

> What is fairly attributable is a matter of normative judgment, and the criteria lack rigid simplicity. From the range of circumstances that could point toward the State behind an individual face, no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government.

*Brentwood*, 121 S. Ct. at 930; *see also Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722 (1961) (noting that it is an "'impossible task'" to "fashion and apply a precise formula for recognition of state

responsibility under the Equal Protection Clause"); *Arlosoroff v. NCAA*, 746 F.2d 1019, 1021 (4th Cir. 1984) (recognizing that "[t]here is no precise formula to determine whether otherwise private conduct constitutes 'state action.'").

Nevertheless, several factors or circumstances bearing upon the issue of whether private conduct "can fairly be attributed to the State" for purposes of § 1983 liability have been clearly delineated by precedent. *Blum*, 457 U.S. at 1004. Of particular relevance here, the Supreme Court has held that challenged activity may be found to be state action where "the State 'has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.'" *American Mfrs.*, 526 U.S. at 52 (quoting *Blum*, 457 U.S. at 1004); *see also Brentwood*, 121 S. Ct. at 930. And, "the required nexus may be present if the private entity has exercised powers that are 'traditionally the exclusive prerogative of the State.'" *Blum*, 457 U.S. at 1005 (quoting *Jackson*, 419 U.S. at 353); *see also American Mfrs.*, 526 U.S. at 55; *Brentwood*, 121 S. Ct. at 930 ("We have treated a nominally private entity as a state actor . . . when it has been delegated a public function by the State." (citing *West v. Atkins*, 487 U.S. 42, 56 (1988)); *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 627-28 (1991)); *Goldstein*, 218 F.3d at 348 (holding "that when it has been established that the State has empowered, or is permitting, a private actor to homestead on territory that has heretofore been the exclusive, traditional province of the State, there need be no specific demonstration of a nexus to the alleged constitutional violation").

Although not directly pertinent to the state action inquiry here, state action has also been found in circumstances where the private actor operates as a "'willful participant in joint activity with the State or its agents,'" *Brentwood*, 121 S. Ct. at 930 (quoting *Lugar*, 457 U.S. at 941), or when "a nominally private entity . . . is controlled by an 'agency of the State,'" *id.* (quoting *Pennsylvania v. Board of Dirs.*, 353 U.S. 230, 231 (1957) (per curiam) (holding that state agency acting as a trustee for a private trust violated the Fourteenth Amendment when it refused to allow admission of black applicants to a college in accordance with the private trust that created it); *see also Evans v. Newton*, 382 U.S. 296, 302 (1966) (holding that park established for the use of only white persons by a private trust must be treated as

public institution for purposes of the Fourteenth Amendment). And, state action has been found where a private entity is entwined with governmental policies or the government is entwined in the management or control of a private entity. *See Brentwood*, 121 S. Ct. at 927 (holding that the regulatory activity of a private, statewide athletic association "should be treated as state action owing to the pervasive entwinement of state school officials in the structure of the association."); *Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374, 400 (1995) (holding that Amtrak, a corporation created and controlled by the government, would be considered an agency or instrumentality of the government for purposes of individual constitutional rights); *Evans*, 382 U.S. at 299 ("[W]hen private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations.").

Finally, we note that even the presence of these circumstances or factors might not be conclusive of the state action issue because "facts that suffice to show public action (or, standing alone, would require such a finding) may be outweighed in the name of some value at odds with finding public accountability in the circumstances." *Brentwood*, 121 S. Ct. at 934; *see Polk County v. Dodson*, 454 U.S. 312, 323 n.13 (1981) (holding that actions of a public defender employed by the State were private despite public employment because a public defender does "not ac[t] on behalf of the State; he is the State's adversary").

## IV.

On appeal, Mentavlos contends that the district court erred in concluding that Anderson and Saleeby did not act under color of state law when they allegedly harassed and abused her because of her gender. Specifically, Mentavlos contends that the district court applied the wrong test for state action, and that we should conclude that the challenged actions are fairly attributable to the State, and therefore were taken under color of state law, because (1) training civilians for the military in a rigorous military environment is a traditional governmental function, and (2) the cadets were acting pursuant to the disciplinary authority bestowed upon them by the rules, regulations, and customs of The Citadel, which receives substantial assistance, primar-

ily financial in nature, from the State of South Carolina. We address each contention in turn.

A.

We begin with Mentavlos' assertion that the district court applied the wrong test for state action because the court cited to the "state action" criteria described by this court in *Haavistola v. Community Fire Company*, 6 F.3d 211 (4th Cir. 1993), in rendering its decision. According to Mentavlos, this was error because *Haavistola* has now been overruled, albeit implicitly, by our decision in *Goldstein v. Chestnut Ridge Volunteer Fire Company*, 218 F.3d 337 (4th Cir. 2000). We disagree.[4]

Although "'cases deciding when private action might be deemed that of the state have not been a model of consistency,'" *Lebron*, 513 U.S. at 378 (quoting *Edmonson*, 500 U.S. at 632 (O'Connor, J., dissenting)), the critical inquiry has remained constant. After examining the relevant facts and circumstances, "the inquiry in each case is whether the conduct is fairly attributable to the state." *Arlosoroff*, 746 F.2d at 1021; *see also Burton*, 365 U.S. at 722); *United Auto Workers Local 5285 v. Gaston Festivals, Inc.*, 43 F.3d 902, 906 (4th Cir. 1995) ("The central inquiry in determining whether a private party's conduct will be regarded as action of the government is whether the party can be described in all fairness as a state actor." (internal quotation marks omitted)).

When determining whether challenged conduct is "fairly attributable" to the State, this court has, from precedents existing at the pertinent times and in light of the specific facts before it, defined various tests or factors which may be considered. For example, in *Andrews v. Federal Home Loan Bank*, 998 F.2d 214 (4th Cir. 1993), we identified four circumstances under which the Supreme Court had held that

---

[4]We note the compelling counter-argument that a panel of this court cannot overrule, explicitly or implicitly, the precedent set by a prior panel of this court. Only the Supreme Court or this court sitting *en banc* can do that. *See Bell v. Jarvis*, 236 F.3d 149, 159 (4th Cir. 2000) (en banc). We simply do not read *Goldstein* as an attempt to do so.

a private party may be deemed a state actor for purposes of § 1983 liability:

> (1) when the state has coerced the private actor to commit an act that would be unconstitutional if done by the state; (2) when the state has sought to evade a clear constitutional duty through delegation to a private actor; (3) when the state has delegated a traditionally and exclusively public function to a private actor; or (4) when the state has committed an unconstitutional act in the course of enforcing a right of a private citizen.

*Id.* at 217; *see also DeBauche v. Trani*, 191 F.3d 499, 507 (4th Cir. 1999), *cert. denied*, 120 S. Ct. 1451 (2000).

In *Haavistola*, another panel of this court summarized three situations in which conduct by a private entity could be fairly attributable to the state: (1) when a sufficiently close nexus exists between a regulated entity and a state such that the actions of the former are fairly treated as those of the state; (2) when the state "has exercised coercive power or has provided such significant encouragement that the action must in law be deemed to be that of the state"; and (3) "when the private entity has exercised powers that are traditionally the exclusive prerogative of the state." *Haavistola*, 6 F.3d at 215 (internal citations and quotation marks omitted).

Most recently, in *Goldstein*, we emphasized the fact-based nature of the state action inquiry, reiterating that "the state action determination requires an examination of all the relevant circumstances, in an attempt to evaluate the degree of the Government's participation in the private party's activities." *Goldstein*, 218 F.3d at 342 (internal quotation marks omitted). There, we identified several considerations which are pertinent to the inquiry: (1) "whether the injury caused is aggravated in a unique way by the incidents of governmental authority"; (2) "the extent and nature of public assistance and public benefits accorded the private entity"; (3) "the extent and nature of governmental regulation over the institution"; and (4) "how the state itself views the entity, *i.e.*, whether the state itself regards the actor as a state actor." *Id.* at 343 (internal quotation marks omitted). Like its predecessors in this circuit, however, the *Goldstein* decision summarized

considerations already set forth by precedent, and did not purport to overrule our prior precedents or espouse new areas of inquiry. Indeed, *Haavistola* summarized the standard set forth by the Supreme Court in *Blum*, 457 U.S. at 1004-05, *see Haavistola*, 6 F.3d at 215, which is still relied upon by the Court today, *see Brentwood*, 121 S. Ct. at 930.

Accordingly, we reject Mentavlos' assertion that *Haavistola* was overruled by *Goldstein* and, as a consequence, that the district court applied an incorrect test to the facts before it. Like our colleagues in prior panel decisions, we are guided in this complex area by the factors which have been described by the Supreme Court in prior precedents and which are pertinent to the circumstances of this case. Thus, we turn to the ultimate inquiry before us: Is there a sufficiently "close nexus" between the challenged actions of Anderson and Saleeby and the State of South Carolina such that their actions "'may be fairly treated as that of the State itself.'" *Brentwood*, 121 S. Ct. at 930 (quoting *Jackson*, 419 U.S. at 351).

### B.

We begin with Mentavlos' claim that the actions of The Citadel cadets were taken "under color of" state law because the State has delegated to The Citadel and its Corps of Cadets "'powers traditionally exclusively reserved to the State.'" *See American Mfrs.*, 526 U.S. at 55 (quoting *Jackson*, 419 U.S. at 352). Specifically, Mentavlos asserts that The Citadel is in the business of serving the traditional governmental function of training civilians for the military in a rigorous military environment much like the United States service academies — Westpoint, the Naval Academy, and the Air Force Academy. Because cadets at military academies have been considered to be "in the military" for purposes of the *Feres* doctrine, *see Feres v. United States*, 340 U.S. 135, 146 (1950) (holding that military personnel may not bring suit under the FTCA for injuries sustained in the course of military service); *see also Collins v. United States*, 642 F.2d 217, 220-21 (7th Cir. 1981) (applying *Feres* doctrine to a cadet at Air Force Academy), the argument goes, we should hold that student cadets at The Citadel are "in the military" for purposes of the color-of-state-law requirement of § 1983.

1.

Like the district court, we find Mentavlos' proffered analogy to military service academies and their cadets to be untenable. We recognize that "[o]ne of the paradigmatic means by which a private party becomes subject to section 1983 is through the government's conferral upon that party of what is, at core, a sovereign power." *Gaston*, 43 F.3d at 906. And, we have little trouble accepting that training civilians who have enlisted in the military for military service is fairly characterized as a traditionally sovereign power. However, The Citadel, unlike the military service academies, is not in the business of training soldiers for military service.

Although The Citadel utilizes a military-style environment, its stated mission is "to educate male undergraduates as members of the South Carolina Corps of Cadets and to prepare them for post-graduate positions of leadership through academic programs of recognized excellence supported by the best features of a structured military environment." Supp. J.A. 346. In other words, the mission of The Citadel is to educate civilian students and produce community leaders, which has never been held to be the exclusive prerogative of a State. *Cf. Rendell-Baker*, 457 U.S. at 842 (holding that education of maladjusted high school students, while a public function, is not one traditionally reserved to the states); *Arlosoroff*, 746 F.2d at 1021 (holding that the regulation of inter-collegiate athletics is not a function traditionally, exclusively reserved to the state). Noticeably absent, of course, is a mission to train soldiers for the military.

Nor does the Citadel's use of a military-style environment fairly compel the conclusion that The Citadel has been delegated the sovereign function of training young men and women for the military. As part of its curriculum, The Citadel requires its Corps of Cadets students to participate in a Senior ROTC program. But, like other state-supported colleges, The Citadel is not a formal part of the United States military, nor are its students enlisted members of a military branch. As is the case with ROTC students at all civilian college campuses, Citadel students may enlist in the armed forces in conjunction with their ROTC training, but have no service commitment by virtue of their mere attendance at The Citadel. They are no more members of a military branch than students attending the other state-supported

colleges and universities in South Carolina. As the district court aptly observed:

> [w]hile The Citadel bases its educational experience on a military model, the comparison to the [service] academies ends there. The education is no more at government expense than at any other state supported college. Neither do Citadel students incur a service obligation simply because they attend The Citadel. Most significantly, Citadel cadets are not members of the armed forces, unless they are members of the reserve as a consequence of signing a contract in a ROTC program. In that regard, Citadel cadets stand in no different position than an ROTC student at any other college, whether public or private.

*Mentavlos*, 85 F. Supp. 2d at 622 (footnote omitted). The numbers confirm this fact: only two of 1800 students at The Citadel in 1996 were commissioned military officers (and those two only because they had attended an early commissioning program elsewhere) and it was stipulated that only about one-third of the Corps of Cadets enters military service upon graduation. Furthermore, none of the cadets involved here (Mentavlos, Anderson, or Saleeby) held ROTC contracts. Consequently, we are not persuaded that The Citadel is analogous to the service academies of the United States military, or that it has otherwise been delegated the sovereign task of training soldiers for service in the military.[5]

For similar reasons, Mentavlos' reliance upon application of the *Feres* doctrine to cadets at the military service academies is inapt. In *Collins*, the Seventh Circuit applied the *Feres* doctrine to a United States Air Force Academy cadet. *See Collins*, 642 F.2d at 220. Air Force Academy cadets, however, were considered members of the Air

---

[5]Mentavlos' reliance upon *Dobyns v. E-Systems, Inc.*, 667 F.2d 1219 (5th Cir. 1982), does not counsel a different conclusion. In *Dobyns*, a private company engaged as a "peacekeeper," providing military protection in the Sinai for the federal government, was held to be a state actor. *See id.* at 1220. The Citadel and its cadets, of course, are not engaged in military protection, nor have the functions of military protection or military training been delegated to them by the state or federal governments.

Force by statute, subject to military discipline, and eligible for certain veterans' benefits. *See Collins*, 642 F.2d at 220-21. Unlike students accepted into one of the military service academies, who are on active duty in the military and will enter military service, students at The Citadel may or may not enter military service upon the completion of their collegiate years. Simply stated, students at The Citadel are not "in the military," nor is there precedent which would lead us to a contrary result.[6]

Finally, Mentavlos' reliance upon *United States v. Virginia*, 518 U.S. 515 (1996), does not avail her. There, the Supreme Court described the mission of the Virginia Military Academy (VMI), a similar state military college, as "producing citizen soldiers." *Id.* at 541. As an initial premise, we note that the mission of The Citadel makes no such reference to this military-type goal; rather, the stated mission of The Citadel is to produce community leaders, not soldiers. But, even if one of The Citadel's purposes was to train civilian soldiers and its upperclass cadets were engaged in serving that purpose, it would not be enough to transform the individual students' actions into state action. Although military training of enlisted soldiers is a governmental function, military-type training of non-enlisted students at a state-supported college is a much different charge. There are numerous ROTC programs operating at public and private campuses all over this country, not to mention state supported and private academies and schools with junior ROTC groups, performing military-type training similar to that performed at The Citadel. As noted by the district court, there is "no significant distinction between what The Citadel does and what many private secondary schools do: using a military model as a basis for instilling discipline and providing leadership training." *Mentavlos*, 85 F. Supp. 2d at 623. Consequently, the district court observed that,

---

[6]Mentavlos' reliance upon *Alton v. Texas A&M University*, 168 F.3d 196, 199-200 (5th Cir. 1999), and *Wake v. United States*, 89 F.3d 53 (2d Cir. 1996), is also misplaced. In *Alton*, the court assumed, but expressly did not decide, that students at Texas A&M, a military college similar to The Citadel, were state actors. *See Alton*, 168 F.3d at 199-200. In *Wake*, a student of Norwich University, also a military college, was held subject to the *Feres* doctrine. *See Wake*, 89 F.3d at 62. However, the student was an enlisted member of the Navy Reserves, traveling in a Navy ROTC vehicle incident to military service when injured. *See id.* at 55-57.

[u]nder [Mentavlos'] theory, every high school military academy would be engaged in an "exclusive state function." The long standing prevalence of such private institutions, demonstrates the non-exclusivity of military model training. Indeed, it would appear that most high schools based on a military model are private institutions, although Junior ROTC is offered at a number of public schools as a component of the educational offerings. In short, education and training based on a military model are not historically an exclusive state function.

*Id.* Therefore, we hold that the district court did not err in concluding that The Citadel cadets have not been cloaked by the State of South Carolina with sovereign powers traditionally reserved exclusively to the government.

2.

Mentavlos also attempts to equate The Citadel to the miliary service academies because The Citadel and its cadets are entitled to certain special benefits conferred by the federal and state governments. Specifically, under the Senior Reserve Officers' Training Corps (the Senior "ROTC") Act, *see* 10 U.S.C.A. §§ 2101 to 2111b (West 1998 & Supp. 2000), The Citadel and five additional civilian colleges are designated as "senior military colleges," recognized for the quality of the military leaders they produce, *see* 10 U.S.C.A. § 2111a(f).[7] As such, Congress has provided that active duty military officers may be designated to serve as the Commandant or Assistant Commandant of the college and to serve as instructors and tactical officers under certain circumstances, *see* 10 U.S.C.A. §§ 2111a(a)-(c), and students who graduate from senior military colleges are guaranteed active duty assignments in the military upon graduation if they desire such service, are otherwise qualified medically and physically, and are recommended for such duty by their ROTC professors of military science at the college, *see* 10 U.S.C.A. § 2111a(e). South Carolina also

---

[7]The six Senior Military Colleges are Texas A & M University, Norwich University, The Virginia Military Institute, The Citadel, Virginia Polytechnic Institute and State University, and North Georgia College and State University. *See* 10 U.S.C.A. § 2111a(f) (West 1998).

affords special consideration to certain persons affiliated with The Citadel, although not to the student cadets. It has provided that "[a]ll members of the board of visitors, administrative staff and faculty personnel of The Citadel, the Military College of South Carolina, shall be eligible to be commissioned officers in the unorganized militia of South Carolina." S.C. Code Ann. § 25-1-520 (Law. Co-op. 1989).

Mentavlos claims that because the United States Congress has recognized The Citadel as a "senior military college" entitled to certain federal benefits and because the South Carolina legislature has bestowed special consideration to it, the State of South Carolina would consider the actions of the cadets to be governmental action by the State itself. We disagree.

By legislation, Congress has provided that senior military colleges may be provided with military officers to serve in the college administration and that graduates of those colleges, if they so request, will be allowed to join and serve in the military as commissioned officers if otherwise qualified. At best, however, this legislation reflects recognition of the value of the military type experience provided by the colleges and, in that respect, The Citadel and its cadets may indirectly serve a governmental function. But, this is insufficient to support a finding of state action. Whereas state action may been found "in the exercise by a private entity of powers traditionally exclusively reserved to the State," *Jackson*, 419 U.S. at 352, the "public function test is so carefully confined" that it "has been found in only narrow circumstances," *Goldstein*, 218 F.3d at 348 (internal quotation marks omitted). *See also DeBauche*, 191 F.3d at 508 (noting that the public function "category is very narrow"). "[T]he relevant question is not simply whether a private group is serving a public function," but whether "the function performed has been traditionally the *exclusive* prerogative of the State." *Rendell-Baker*, 457 U.S. at 842 (internal quotation marks omitted); *see also Jackson*, 419 U.S. at 353; *Haavistola*, 6 F.3d at 216. Thus, "[t]he fact that a private entity performs a function which serves the public does not make its acts governmental action." *American Mfrs.*, 526 U.S. at 56 (quoting *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm'n*, 483 U.S. 522, 544 (1987)). Consequently, it cannot fairly be said that Congress, by affording a senior military college and its cadets certain legislative

benefits, delegated a traditional, exclusive governmental function to The Citadel or to its non-enlisted, non-military student cadets.

Nor are we persuaded by Mentavlos' claim that the State of South Carolina would view Citadel cadets as state actors as a consequence of this legislative enactment. In the context of the traditional, exclusive governmental function test, "[a]nother factor relevant to the state action determination is how the state itself views the entity." *Goldstein*, 218 F.3d at 347; *see also Haavistola*, 6 F.3d at 218 (holding that the determination of "when a private entity assumes the role of state actor due to its involvement or provision of an exclusive public function . . . hinges on how a given state itself views the conduct of the function by the private entity."). While not a dispositive factor, the fact that a state views a private entity as a state actor understandably "militates in favor of our finding of state action." *Goldstein*, 218 F.3d at 347. Mentavlos, however, points to nothing within the federal act which would support a conclusion that the State of South Carolina would consider Citadel students to be state actors, for whose actions the State should be held liable. And, the contention that the State of South Carolina would consider The Citadel cadets to be state actors by virtue of a state legislative enactment according a special benefit, not upon the cadets, but upon employees and governing members of The Citadel, is plainly without merit.

## C.

Mentavlos next contends that the actions of Anderson and Saleeby are "fairly attributable to the State," and therefore should be considered to have been taken under color of state law, because the State provides financial assistance to The Citadel and extensively regulates its military program. We disagree.

As noted previously, because Anderson and Saleeby are private students, they may not be held to constitutional standards unless there is a sufficiently "close nexus" between the State and their challenged actions such that "the latter may be fairly treated as that of the State itself." *American Mfrs.*, 526 U.S. at 52 (internal quotation marks omitted); *see Brentwood*, 121 S. Ct. at 930. The determination of "[w]hether such a 'close nexus' exists," in turn, "depends on whether the State 'has exercised coercive power or has provided such signifi-

cant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.'" *American Mfrs.*, 526 U.S. at 52 (quoting *Blum*, 457 U.S. at 1004)). Action which is taken by private persons "with the mere approval or acquiescence of the State" is not sufficient to justify a holding that the action is state action. *American Mfrs.*, 526 U.S. at 52; *see also Flagg Bros. v. Brooks*, 436 U.S. 149, 164 (1978) ("This Court . . . has never held that a State's mere acquiescence in a private action converts that action into that of the State."). More than the mere adoption of "'a passive position toward the underlying private conduct'" is required. *Goldstein*, 218 F.3d at 342 (quoting *Skinner v. Ry. Labor Executive Ass'n*, 489 U.S. 602, 615 (1989). Rather, we look for "indices of the Government's encouragement, endorsement, and participation" in the challenged actions. *Skinner*, 489 U.S. at 615-616.

The district court found that Mentavlos failed to make this showing, noting that while the actions of Anderson and Saleeby "may have been made possible by the system established by the state," the "cadets did not receive significant encouragement and did not exercise the state's coercive powers" in so acting. *Mentavlos*, 85 F.Supp.2d at 625. We agree.

### 1.

We need not tarry long with Mentavlos' claim that Anderson and Saleeby were state actors for purposes of § 1983 because The Citadel, as a state-supported college, is governed by state officials whose powers are defined by statute and receives financial assistance and other support from the state. *See generally* S.C. Code Ann. § 59-101-10 (Law. Co-op. Supp. 2000) (listing state-supported colleges and universities in South Carolina); S.C. Code Ann. §§ 59-121-10 to 450 (Law. Co-op. 1990 & Supp. 2000) (statutes pertaining to the operation of The Citadel). While substantial state assistance is generally a factor to be considered in determining whether the state has coerced or significantly encouraged private action, *see Goldstein*, 218 F.3d at 347, a private party's dependence upon the state for assistance, even if substantial, does not transform its actions into actions of the state, *see Rendell-Baker*, 457 U.S. at 840-41 (holding that a private school's near total dependence upon the State for funds did not render its employee discharge decisions acts of the State); *Blum*, 457 U.S. at

1011 (holding that similar dependence of nursing homes on state funds did not make the acts of its physicians and administrators acts of the State); *Goldstein*, 218 F.3d at 347 (the "receipt of state funds alone is insufficient to transform private actions into state actions" (internal quotation marks omitted)). In this case, The Citadel's receipt of state financial assistance renders it no different in any material respect from the other state-supported institutions of higher learning in the state. *See e.g.* S.C. Code Ann. §§ 59-117-10 to 330 (Law. Co-op. 1990 & Supp. 2000) (statutes pertaining to the University of South Carolina); S.C. Code Ann. §§ 59-119-10 to 1050 (Law. Co-op. 1990 & Supp. 2000) (statutes pertaining to Clemson University).

Mentavlos' claim in this regard, however, also fails on a more basic level. While state assistance provided to The Citadel might be pertinent to a determination of whether The Citadel is a state actor, that is not the issue before us. Nor, for that matter, does it appear to be a fact in dispute. Rather, this case involves the question of whether students who attend The Citadel, as opposed to The Citadel or its employees or administrators, are state actors for purposes of § 1983. The Citadel was created by and receives assistance from the state, as all state-supported colleges do, and its employees are paid by the state. But, Mentavlos has pointed to no special state assistance, financial or otherwise, which was provided to the students of The Citadel, much less such assistance which could warrant a finding that they were state actors. Of course, we cannot fairly view the unauthorized actions of private students to be state action merely because they attend a state-supported college and receive the benefit of public funds.

## 2.

We are also unpersuaded by Mentavlos' claim that the State of South Carolina's regulation of The Citadel and, in turn, The Citadel's rules and regulations made applicable to its students, should compel the conclusion that Anderson and Saleeby were acting "under color of" state law when they engaged in the challenged actions. Specifically, Mentavlos claims that upperclass cadets at The Citadel, by virtue of the Cadet Regulations (*i.e.*, the Blue Book) and the customs at the school, were given broad power or authority to punish freshmen

"fourth class" cadets and to engage in hazing such as that allegedly suffered by Mentavlos.

Although Mentavlos correctly asserts that "the extent and nature of governmental regulation over the institution" is a factor to be considered in the state action inquiry, *see Goldstein*, 218 F.3d at 343, the mere fact that a private individual or "business is subject to state regulation does not by itself convert its action into that of the State," *Blum*, 457 U.S. at 1004 (quoting *Jackson*, 419 U.S. at 350). And, "state regulation unrelated to the alleged constitutional violation, even if extensive, is not sufficient, in itself," to transform private action into state action. *Goldstein*, 218 F.3d at 347.

In this case, contrary to Mentavlos' characterization, the Blue Book does not grant to upperclass cadets broad power or authority to discipline freshmen cadets, nor cloak upperclass cadets with the authority of the State for all purposes. Rather, the authority of upperclass cadets at The Citadel is quite limited. Freshmen cadets are directed to obey orders from upperclass cadets. But, within the confines of the same system creating the authority of upperclass cadets to correct freshmen cadets for minor violations and to report others, The Citadel expressly requires the cadets to deal with the incoming freshmen women in a professional manner and expressly prohibits hazing, abusive treatment, or discrimination of any student, male or female. Cadets are required to obtain express permission from a fellow cadet before engaging in even the slightest touching of the cadet, and upperclass cadets are not authorized to impose disciplinary action, except for the most minor rule infractions.

In addition to the limited nature of this grant of authority, The Citadel provides its students with a variety of methods to report violations of the fourth class system, requires the immediate reporting of alleged abuses by all students, and renders expedient punishment for violations of the fourth class system, including violations of the prohibition against abusive or discriminatory treatment. Indeed, the abuses Mentavlos reported were punished when brought to the attention of The Citadel administration and were not taken lightly.

Consequently, upperclass Citadel cadets have some limited measure of authority over freshmen cadets like Mentavlos by virtue of the

unique fourth class system created and sanctioned by The Citadel and The Citadel administration has tolerated the not uncommon military-type practice of upperclassmen mildly harassing freshmen either verbally or by requiring them to engage in undesirable, but physically harmless, tasks such as cleaning or polishing. However, the school clearly "did not endorse or encourage abuses of the fourth class system and, in fact, endeavored to discourage abuses of the type alleged by" Mentavlos. *Mentavlos*, 85 F. Supp. 2d at 619. Additionally, Mentavlos presented no contrary evidence that any member of The Citadel administration, faculty, or staff ever encouraged, endorsed, participated in, refused to prevent, or acquiesced in the challenged actions.

In *Milburn v. Anne Arundel County Department of Social Services*, 871 F.2d 474, 479 (4th Cir. 1989), we declined to hold that abusive foster parents were "state actors" for purposes of § 1983, despite the fact that the foster parents were licensed by the state and were entrusted by the state with the care of the abused child. The state "was not responsible for the specific conduct of which the plaintiff complain[ed], that is, the physical child abuse itself . . .[,] exercised no coercive power over the [foster parents]," and did not "encourage them" in any way. *Id.*; *see also Leeds v. Meltz*, 85 F.3d 51, 54 (2d Cir. 1996) (holding that extensive regulation and public funding, while factors to be considered, cannot "transform a private actor into a state actor; instead, the state must have exerted its coercive power over, or provided significant encouragement to, the defendant before the latter will be deemed a state actor").

Similarly, the findings of the district court in this case, which are not clearly erroneous, demonstrate that the challenged actions of Anderson and Saleeby could not be fairly characterized as taken in furtherance of the limited authority granted to upper class cadets to instruct and correct fourth class cadets under the Blue Book, nor taken by virtue of a Citadel "custom" to engage in the types of abusive, harassing acts of which Mentavlos' complains.

3.

Mentavlos advances two additional arguments as to why we should consider the challenged actions of Anderson and Saleeby to be state action, neither of which we find to be persuasive.

First, Mentavlos asserts that it is of no consequence that Anderson and Saleeby acted in obvious contravention of the Blue Book's express prohibitions because state officials acting in their official capacities are generally held to act "under color of" state law, even if they act in abuse of their lawful authority. *See United States v. Classic*, 313 U.S. 299, 326 (1941); *Ex parte Virginia*, 100 U.S. 339, 346-47 (1880). Such a "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law," Mentavlos asserts, must be considered to be action taken "under color of" state law. *Classic*, 313 U.S. at 326 (finding that state election officials acted "under color of" state law when they failed to count votes as cast, altered ballots, and falsified certification of the votes); *see also Screws v. United States*, 325 U.S. 91, 107 (1945) (finding that a sheriff and his deputy acted "under color of" state law when they killed a prisoner in their care without justification). Because the Blue Book also required freshmen to obey the orders of upperclass cadets, the argument goes, the upperclass cadets were effectively placed in a position analogous to state law enforcement officials, rendering their wrongful actions state action for purposes of § 1983.

In support of this proffered analogy, Mentavlos relies particularly upon our decision in *Scott v. Vandiver*, 476 F.2d 238 (4th Cir. 1973), in which we held that two county employees deputized by a local sheriff could be "state actors" for purposes of § 1983 where they misused the law enforcement power granted by state law by utilizing excessive force in trying to arrest an innocent person. Pursuant to a longstanding agreement with the county supervisor, county employees could be requested to assist the sheriff on manhunts and the two men involved had served in this role in the past. As such, we held that the county employees were also temporary law enforcement officers when they arrested the plaintiff, "bring[ing] them squarely within § 1983." *Id.* at 241.

In contrast to the county employees in *Scott*, who had been designated law enforcement officials at the time they engaged in the challenged actions, we declined to hold county employees liable under § 1983 for an assault upon a fellow employee in *Hughes v. Halifax County School Board*, 855 F.2d 183 (4th Cir. 1988), even though the assault occurred during working hours, on county property, for

motives related to their employment with the county. We rejected the claim that the co-employees "were clothed with state authority in so acting," *id.* at 186, noting that unlike in the case of police officers or judges who abuse their state authority while clothed with state power, "[t]he indicia of state authority just isn't the same," *id.* at 187.

In this case, we are not confronted with the question of whether state officials or employees have acted in abuse of lawful authority granted to them by the State. The Citadel may operate under a stricter form of student self-government, and one unique to military-style colleges, but the concept of student self-governance at public and private institutions of higher education, including the use of honor codes and the limited delegation of disciplinary authority to certain members of the student body, is hardly a novel concept. A public school or college student is not fairly transformed into a state official or state actor merely because the school has delegated to that student or otherwise allowed the student some limited authority to act. *Cf. Yeo v. Town of Lexington*, 131 F.3d 241 (1st Cir. 1997) (en banc) (holding that student editor's decision not to publish an ad in the school yearbook was not state action); *Indorato v. Patton*, 994 F. Supp. 300 (E.D. Pa. 1998) (holding that state university football player who struck a referee during a sanctioned football game was not a state actor).

Instead, we are called upon to decide whether the State has encouraged or coerced private individuals to take action which is violative of the constitutional rights of another. At best, Anderson and Saleeby, by virtue of their status as college juniors at The Citadel, were asked and expected to assist in the instruction and correction of freshmen cadets in the applicable rules of The Citadel, but were expressly prohibited from engaging in any actions which could be considered hazing or otherwise abusive of the freshmen students. Mentavlos, having been provided with a copy of the regulations governing their conduct, was made aware of the limitations on the authority given to upperclass cadets and knew that most or all of the alleged instances of harassment were beyond the authority given and, indeed, in violation of The Citadel's hazing policy. We do not view this limited grant of authority to upperclass students to be analogous to the situation of police officers given broad authority to detain and arrest. Unlike in the case of police officers, or other state officials using their positions to accomplish an unlawful purpose, the cadets were not cloaked with

such broad power, nor were they acting pursuant to the limited authority vested in them by the Blue Book. They were students at a state-supported college, acting in a manner proscribed by The Citadel and known by Mentavlos to be violative of the applicable rules. Under these circumstances, their actions cannot in law or fairness be attributed to the State of South Carolina, which is the pertinent inquiry demanded by the facts before us today. *See Brentwood*, 121 S. Ct. at 930; *American Mfrs.*, 526 U.S. at 50; *cf. Lugar*, 457 U.S. at 940 (holding that plaintiff did not state a cause of action under § 1983 because the allegation that a private party's conduct was "unlawful under state law" was tantamount to saying that the conduct "could not be ascribed to any governmental decision; rather, respondents were acting contrary to the relevant policy articulated by the state" (internal quotation marks omitted)).

Mentavlos also offers the Court's recent decision in *Santa Fe Independent School District v. Doe*, 120 S. Ct. 2266 (2000), as support for her claim that the actions of the cadets should be attributed to The Citadel and the state. In *Santa Fe*, the Supreme Court confronted the question of whether student-led, student-initiated invocations offered prior to football games should be considered private speech endorsing religion protected by the Free Speech and Free Exercise Clause or government speech endorsing religion which the Establishment Clause would forbid. Although the school district's policy purported to allow the students to offer either a religious or non-religious invocation or message, the Court concluded that the religious messages could not be considered private speech because the messages were authorized by government policy, took place on government property at government-sponsored school-related events and, of particular significance, were explicitly and implicitly endorsed and encouraged by the school district. *See id.* at 2275-77. To the extent *Santa Fe* has application to the claim before us, it is readily distinguishable because The Citadel did not authorize its students to engage in the challenged harassing actions, and did not endorse or encourage them to do so. The Citadel, on the contrary, expressly prohibited acts of this nature.

Because the cadets' decision to engage in unauthorized harassment of Mentavlos was not coerced, compelled, or encouraged by any law, regulation or custom of the State of South Carolina or The Citadel, we hold that the actions of the student cadets cannot "in all fairness"

be considered attributable to the State for purposes of § 1983. Accordingly, the requisite "close nexus" between The Citadel's creation and sanctioning of the fourth class system and the specific actions which Mentavlos alleges violated her constitutional right to equal protection under the Fourteenth Amendment is lacking.

## V.

For the foregoing reasons, we agree with the district court's determination that the alleged conduct of Citadel cadets Anderson and Saleeby is not "fairly attributable" to The Citadel or the State of South Carolina such that it would be proper to conclude that they were state actors when they allegedly deprived Mentavlos of her constitutional right to equal protection under the Constitution. Because Anderson and Saleeby did not act "under color of" state law when they engaged in the challenged actions, we affirm the district court's grant of summary judgment to them.[8]

*AFFIRMED*

---

[8]Because we conclude that Anderson and Saleeby did not act under color of state law, we need not reach the issue of whether their actions, if taken under color of state law, would have deprived Mentavlos of a right secured by federal law. Consequently, we also need not consider Mentavlos' appeal of the district court's grant of summary judgment to Saleeby on the additional ground that Mentavlos failed to present evidence that he acted with improper gender animus.